## JEROME v. COGSWELL.

ERROR TO THE SUPREME COURT OF ERRORS OF THE STATE OF
CONNECTICUT.

No. 80. Argued November 2, 1906.—Decided January 7, 1907.

Where the stock of a national bank is reduced pursuant to § 5143, Rev.
Stat., but beyond the amount required to meet an impairment of capital,
and the reduction is made by charging off doubtful assets to the amount
of the reduction, the stockholders of record on the day of the reduction
are entitled to the assets thereby set free, which, and their proceeds, may
be set apart as a trust fund for such stockholders. And transfers of stock
made after the reduction do not carry the interest of the original stock-
holders in that fund.

78 Connecticut, 75, affirmed.

THE Second National Bank of Norwich, Connecticut, was
a banking association, organized and existing under the laws
of the United States, with a capital stock of $300,000.

As stated, in substance, by the Supreme Court of Errors of
Connecticut, the directors having voted to recommend a
reduction of the capital stock from $300,000 to $200,000, were
advised by the Comptroller of the Currency that it would be
approved, "provided so much of the amount as is necessary
is used to charge off bad, doubtful and unproductive assets,
the difference only being paid to the shareholders in cash,"

and that "the shareholders of a national bank, upon a reduction in capital stock, are entitled to either receive the cash or the charged-off assets, and neither can be withheld without their consent." The Comptroller also informed the president of the bank: "The assets belong to the stockholders of record, and a trust fund must be created, so that those assets may be distributed among the stockholders of record when your capital is reduced." The stockholders, in May, 1900, voted to make the reduction, and the president first, and then the directors, filed with the Comptroller a written statement that "the whole amount of the reduction, viz., $100,000, will be used for the purpose of charging off bad, doubtful and unproductive assets, no money to be paid to the shareholders unless realized from said assets, which are to be set aside and collected for the benefit of the shareholders of record at date of the issuance of the Comptroller's certificate approving the reduction." The Comptroller gave his certificate, dated June 9, 1900, approving the reduction, without any qualifications.

"On June 27th a schedule of certain assets of the bank, each item being given a valuation, and the total valuations of all amounting to $100,307.86, was presented to the directors, who thereupon voted that the assets so scheduled, 'which assets are considered either bad or doubtful, and on account of which the capital stock of the bank has been reduced from $300,000 to $200,000, be set aside from the other assets of the bank and be held by it in trust for the stockholders of record on the ninth day of June, 1900, and that whatever may be realized from said assets be distributed from time to time as may be reasonable among said stockholders in proportion to their respective holdings on said date.'

"Thereupon the account with capital stock on the books of the bank was credited with a reduction of $100,000, and the items named in the schedule above described were charged to the account of profit and loss at the valuation of $100,307.86. Some of the items were of real estate; the rest were not well

secured; and all were those referred to in the directors' statement to the Comptroller dated June 9th.

"This left the bank with good assets worth over $240,000.

"The bank thereafter, until its charter expired in 1903, kept a separate account relating to the assets included in the schedule, entitled 'Stockholders' Trust,' in which were credited all collections and charged all expenditures arising in connection with endeavors to realize upon them.

"Two of the scheduled items represented claims for a larger amount; the valuation affixed to each representing the estimated loss upon it. The same claims were also entered in the books of the bank, as part of its remaining capital, at a valuation for each equal to the difference between its face and the valuation assigned to it in the schedule.

"The receiver has received $20,240 on account of the scheduled assets. Some of them also remain uncollected, but have a value. To one of the items, entered as 'Demand loans, E. A. Packer, $15,647.50,' belonged certain railroad stock held as collateral security. A note for over $1,000, made by 'C. P. Cogswell, trustee,' and discounted by the bank to pay an assessment on this stock, was included in the reduced capital of $200,000, and in March, 1903, was paid off from the proceeds of sales of the stock; leaving a balance of such proceeds, which was included in the $20,240 above mentioned.

"All the certificates representing the shares in the original capital were, on or about July 1, 1900, exchanged by the holders for certificates in favor of each for two-thirds of the number of his original shares."

The charter of the bank expired by lapse of time February 24, 1903, and its affairs were being settled in the manner provided by law, when a complaint in equity was filed by a stockholder in the Superior Court of Connecticut, asking for the appointment of a receiver to wind up its affairs, because of alleged misappropriation, and a receiver was appointed. The receiver filed a petition with the court, stating that in May, 1900, the capital stock of the bank was reduced from

$300,000 to $200,000, and that thereupon assets of the face value of $100,000 were charged off and set aside, and that a question had arisen as to whether the proceeds of those assets be distributed to the stockholders of record at the time of the reduction or of the expiration of the charter.

Claims to the charged-off assets by virtue of ownership of original stock when capital was reduced; of such stock, although it had been surrendered and new stock issued; and of stock after the reduction; were filed.

The Superior Court held that those assets belonged to the bank and should be distributed to the stockholders of record at the expiration of its charter.

The Supreme Court of Errors adjudged that the stockholders of record at time of reduction were entitled to the charged-off assets, and reversed the judgment of the Superior Court with directions to distribute accordingly. 78 Connecticut, 75.

Whereupon this writ of error was brought.

*Mr. Donald G. Perkins*, with whom *Mr. William H. Shields* was on the brief, for plaintiff in error:

This case presents a question within the jurisdiction of and reviewable by the Supreme Court of the United States under U. S. Statutes, § 709. *Williams* v. *Bruffy*, 102 U. S. 248.

The rights and privileges claimed by plaintiff in error depend upon his stock certificates issued by a national bank, and all his rights were governed and controlled by the laws of the United States, and they were necessarily involved in the question before the court, and determined by its decision. *Starin* v. *New York*, 115 U. S. 248; *Mutual Life Ins. Co.* v. *McGrew*, 188 U. S. 309; *Wilson* v. *Marsh*, 2 Pet. 245; *Crowell* v. *Randall*, 10 Pet. 368; *Furman* v. *Nichol*, 8 Wall. 56; *Williams* v. *Hurd*, 140 U. S. 529; *Forks National Bank* v. *Anderson*, 172 U. S. 573; *McCormick* v. *Market National Bank*, 165 U. S. 538; *Waite* v. *Dowley*, 94 U. S. 532; *Kaukauna* v. *Green Bay*, 142 U. S. 269; *Logan Co. Bank* v. *Townsend*, 139 U. S. 67; *Swope*

v. *Leffingwell,* 105 U. S. 3; *California Bank* v. *Kennedy,* 167 U. S. 366; *Green Bay &c. Co.* v. *Patten Paper Co.,* 172 U. S. 58; *Yazoo &c. R. Co.* v. *Adams,* 180 U. S. 15; *Home for Incurables* v. *New York,* 187 U. S. 155.

The determination of the rights of stockholders to a distribution of the assets depends upon the effect of the reduction of capital, the approval of the Comptroller and the vote of the directors in relation to the charged-off assets. The capital of the bank was reduced from $300,000 to $200,000.

The requirement and purpose of the Comptroller were that reduced capital be used to charge off bad debts so far as necessary and the excess only paid in cash to the stockholders. The intent and purpose of the reduction was to charge off the amount of bad and doubtful debts in the schedule and cover any impairment of capital and still leave the bank with a fair surplus.

There was no relation or identity, either in fact or law, between the reduction and any specific property of the bank.

There was no lien or charge in law or equity, in such a case, against the assets, and if so, no power in the directors to create one. A reduction of capital stock to set free unemployed capital would not vest title in stockholders to any specific assets.

Assuming that an equitable title vested in the stockholders to the assets actually charged off, it is apparent that they are not entitled in equity to the assets not fully charged off, but carried in and necessary to make up new capital.

The directors had no power to set apart any specific assets for the stockholders of record. Rev. Stat. § 5143; *Commercial Nat. Bank* v. *Weinhard,* 192 U. S. 249; Rev. Stat. §§ 5134, 5142, 5143; *McCann* v. *First Nat. Bank,* 112 Indiana, 358; 1 Cook on Corporations, 5th ed., § 289; 2 Thompson, Com. on Corporations, § 2119; 2 Morawetz on Priv. Corp., §§ 224, 226; *Jermain* v. *Lakeshore,* 91 N. Y. 483; *Gifford* v. *Thompson,* 115 Massachusetts, 478.

The shareholders at reduction, by transferring their shares, transferred all their rights in capital.

*Mr. Frank T. Brown,* with whom *Mr. Hadlai A. Hull* was on. the brief, for defendants in error: ·

When the capital stock of a national bank is reduced and there is no impairment of its capital, there must be a distribution of assets among the stockholders of record at the date of the reduction. Pratt's Digest, ed. 1905, p. 41; 2 Thompson on Corp., § 2118; 5 Cycl. Law & Pro., 436; *Strong* v. *Brooklyn R. R. Co.,* 93 N. Y. 426. ·

When the net actual capital of a national bank applicable to capital stock is insufficient to make the stock worth par and a reduction of capital stock is made, but to an extent greater that is necessary to meet the impairment, so much of the net actual capital as is not necessary to make the reduced stock worth par, should be distributed among the stockholders of record at the date of the reduction.

It is within the authority of the Comptroller. of the Currency to condition his approval of the reduction of capital stock on the adoption of such measures as he may think proper to do justice to the holders of the original shares.

The· right of the stockholders to a distribution is not, however, dependent upon any action of the Comptroller, but belongs to them under the law independently of any action on the Comptroller's part.

·· MR. CHIEF JUSTICE ·FULLER,. after making the foregoing statement, delivered the opinion of the court.

.This is not· a case involving the rights of creditors or of minority stockholders as such, but a case raising the bare question to whom assets remaining on a valid reduction of the capital stock of a national bank belong.

The National Banking Act (Title LXII, Rev.. Stat.) provides:.

"SEC. 5143. ·Any association. formed under. this title may, by the vote of shareholders owning two-thirds of its capital stock, reduce its capital to any sum not below the amount

required by this title to authorize the formation of associations; but no such reduction shall be allowable which will reduce the capital of the association below the amount required for its outstanding circulation, nor shall any such reduction be made until the amount of the proposed reduction has been reported to the Comptroller of the Currency and his approval thereof obtained."

· The reduction in this case was accomplished at a time when the bank was not being wound up, by the required vote of the stockholders and with the approval of the Comptroller of the Currency, and the new shares on the basis of the reduction were accepted by all the stockholders.

The bank was left with good assets of more than $240,000, or, in other words, with an unimpaired capital stock of $200,000 and a surplus of twenty per cent, that is, $40,000, exclusive of the assets, the distribution of which is the matter in controversy. These assets were set apart in compliance with the requirement of the Comptroller that certain bad, doubtful and unproductive assets should be charged off or set aside for the benefit of those who were stockholders at the date of the approval. This requirement, though not stated in the certificate of approval, was evidently, on the facts, made a condition thereof and presumably in accordance with the practice of the Comptroller's office, and was imposed to the end that justice might be done to the owners of the original shares.

It is said that the original capital of the bank of $300,000 was impaired prior to the reduction, say to the extent of $30,000, as shown by adding to the $240,000 the value of the scheduled assets, estimated at $30,000.

As a general rule, it may be admitted that where capital stock is impaired and a reduction is made merely to meet that impairment, there can be no distribution. But that is not this case, in which the stockholders of record June 9, 1900, had a right to require a distribution among them of an excess upon reduction in proportion to their respective holdings. In the language of the Connecticut Supreme Court: "The

right to receive what might ultimately be realized from the fund thus set apart became therefore irrevocably vested in those who were shareholders on June 9, 1900, and they or their assigns are now entitled to whatever is to be distributed from it."

It follows, as held, that the transfer of shares after the reduction of June 9; 1900, did not carry any right to an interest in the special trust fund, the proportionate interests therein having vested in the then shareholders as individuals. The result is unaffected by the fact that distribution in cash may have been contemplated as the assets set aside were realized upon.

The conclusion at which we have arrived dispenses with the necessity of discussing other questions suggested.

*Judgment affirmed.*