## WESTERN SECURITIES CO. v. SILVER KING CONSOL. MINING CO. OF UTAH et al.

No. 3491.   Decided July 17, 1920.   On Application for Rehearing October 11, 1920.   (192 Pac. 664.)

1. CORPORATIONS—KNOWLEDGE OF OFFICER ACTING ADVERSELY TO CORPORATION NOT IMPUTED TO IT. As a general rule, knowledge or notice to an officer or director of a corporation concerning a transaction in which he is acting adversely to the interests of the corporation is not imputed to the corporation.[1]

2. CORPORATIONS—BID TO DIRECTOR UNAUTHORIZED TO ACT NOT NOTICE TO CORPORATION. A bid for stock held by a corporation in pledge, made to a director who was not authorized to act for the corporation in the sale of the stock, which had been committed to the president and a committee of other directors,

---

[1] Victor G. & S. M. Co. v. National Bank, 15 Utah, 391, 49 Pac. 826; Gay v. Mercantile Inst., 37 Utah, 287, 107 Pac. 237; Lochwitz v. Mining Co., 37 Utah, 349, 108 Pac. 1128.

is not thereby brought to the knowledge of the corporation so as to invalidate a subsequent sale for a smaller sum after the director concealed the bid.

3. CORPORATIONS—NOTICE TO TWO DIRECTORS WHO PARTICIPATED IN VOTE TO SELL STOCK NOT NOTICE TO CORPORATION. Notice to two of the directors of a corporation that a larger bid had been made for stock pledged to the corporation is not notice to the corporation, though the directors participated in the meeting of the board to which the sale of the stock for a smaller bid was authorized.

4. CORPORATIONS—POWER OF SALE HELD TO AUTHORIZE SALE TO STOCKHOLDERS AT FAIR PRICE. Where a corporate stock was pledged to the corporation with power to sell to any person at not less than a minimum price, and to buy the stock itself at such sale, the sale of the stock by the corporation to a stockholder at a fair price exceeding the minimum stated price was not invalid.

5. PLEDGES—PLEDGEE MAY BID AT SALE IF AUTHORIZED BY PLEDGOR. A pledgee may bid at his own sale of the pledged property if he is so authorized by the pledgor.

6. PLEDGES—INADEQUATE PRICE DOES NOT VITIATE SALE. The mere fact that the pledged property was sold by the pledgee under his power of sale for an inadequate price does not invalidate the sale, but merely renders the pledgee liable for the difference btween the sale price and a fair price which could have been obtained.

7. PLEDGES—DAMAGES FOR WRONGFUL SALE OF PLEDGED SECURITIES IS HIGHEST MARKET VALUE WITHIN REASONABLE TIME. In an action for the conversion of securities by a wrongful sale by a pledgee thereof, the measure of damages is the difference between the price obtained and the highest market price for the securities during a reasonable period for their sale after the conversion.[2]

8. CORPORATIONS—EQUITY DOES NOT HOLD INNOCENT STOCKHOLDERS RESPONSIBLE FOR PROFITS BY DIRECTORS ON SALE OF PLEDGED STOCK. Equity does not hold innocent stockholders liable for

[2] *Hatch* v. *Lucky Bill Mining Co.*, 25 Utah, 405, 71 Pac. 865; *Raht* v. *Mining Co.*, 18 Utah, 290, 54 Pac. 889; *Galligher* v. *Jones*, 3 Utah, 54, 1 Pac. 15; *Walley* v. *Deseret National Bank*, 14 Utah, 315, 47 Pac. 147.

profits made by some of the directors of a corporation through a sale by the corporation of stock pledged to it.

9. CORPORATIONS—PRICE FOR SALE OF PLEDGED STOCK HELD REASONABLE. Evidence that a corporation to which stock had been pledged, on receiving a bid from a stockholder for the stock, inquired at length among stockbrokers as to the probability of obtaining a higher price, and secured the advice of reputable counsel, *held* to show that the price obtained was a fair price, though thereafter, due to discovery of new ore, the stock increased in value.

10. CORPORATIONS—STOCK NEED NOT BE SOLD FOR MARKET PRICE. It is not essential to the validity of a sale of pledged stock that it be sold for the full market price of similar stock on the exchange, since the obtaining of such a price for pledged stock is practically impossible.

11. PLEDGES—SALE MAY BE MADE UNDER POWER BEFORE DEBT IS DUE. Where the pledgor gives the pledgee power to sell pledged securities before the debt is due, the pledgee may exercise such power without waiting for the maturity of the debt.

12. CORPORATIONS—SALE OF PLEDGED STOCK FOR INSECURITY MAY BE MADE IF IN GOOD FAITH. Where the pledgor gives the pledgee power to require additional security or to sell the pledged stock if it believes the security is insufficient, the pledgee may make such sale if it believes in good faith that the security is insufficient, though there was no adequate grounds for such belief.

13. CORPORATIONS—DIVIDENDS BELONG TO STOCKHOLDER AT TIME OF DECLARATION. Under Comp. Laws 1917, section 878, providing that, for the purpose of receiving dividends, the holder· of stock of record shall be considered the holder in fact, dividends belong to the· holder of stock at the time they are declared, though the stock is thereafter sold before the dividends are paid, unless the dividends are expressly included in the sale.[3]

14. CORPORATIONS—PLEDGEE CAN RECEIVE DIVIDENDS TO APPLY ON DEBT. Pledgee of corporate stock is entitled to receive dividends declared on the stock and to apply them on the debt secured by the pledge.

---

[3] *Clark* v. *Campbell*, 23 Utah, 569, 65 Pac. 496, 54 L. R. A. 508, 90 Am. St. Rep. 716.

15. CORPORATIONS—PLEDGOR HELD ENTITLED TO DIVIDENDS DECLARED BEFORE SALE BY PLEDGEE. One who pledged corporate stock to the corporation to secure a debt is entitled to have credited on the debt the amount of a dividend declared by the corporation before it accepted a bid for the pledged stock, and can recover from the corporation the amount of such dividend paid by it to the purchaser of the stock.

On Application for Rehearing.

16. APPEAL AND ERROR—CAN REFUSE TO CONSIDER CLAIM FIRST MADE ON REHEARING. The Supreme Court can refuse to consider a claim which is made for the first time on the application for a rehearing.

17. CORPORATIONS—EVIDENCE HELD TO SHOW DIVIDENDS WERE DECLARED AFTER SALE OF PLEDGED SECURITIES. In an action against a corporation and its directors, evidence *held* to sustain the court's finding that the resolution declaring a dividend before the sale by the corporation of the pledged stock did not also declare dividends which were later paid, and which were considered by all parties dealing with the stock as having been declared at later dates.

Appeal from District Court, Third District, Salt Lake County; *Wm. H. Bramel,* Judge.

Action by the Western Securities Company against the Silver King Consolidated Mining Company of Utah and others. Judgment for the plaintiff against the named defendant and one other, and the named defendant appeals, and plaintiff files a cross-appeal.

REVERSED, and REMANDED with directions.

*Howat, Marshall, Macmillan & Crow,* of Salt Lake City, for appellant.

*Walton & Walton* and *Dey, Hoppaugh & Mark,* all of Salt Lake City, for respondent.

FRICK, J.

The plaintiff, a corporation, hereinafter called respondent, commenced this action against the Silver King Consolidated Mining Company of Utah, and against Solon Spiro, John Pingree, Charles E. Kaiser, and L. R. Eccles, all of whom were, at the times referred to in the complaint, directors of said mining company. Judgment was entered against the mining company, and, in case it fails to pay the same, judgment was also entered against the defendant Pingree. L. R. Eccles and Charles E. Kaiser were not served with process and did not appear in the action. Eccles, however, testified as a witness for the plaintiff. The case thus proceeded against the company, Spiro, and Pingree only.

The mining company, hereinafter styled appellant, appeals from the judgment, and respondent has filed a cross-appeal.

The action was commenced June 16, 1917, to require appellant and the other defendants as directors of the appellant to account for the alleged conversion of certain mining stock and for certain dividends paid thereon and for general relief. The pleadings are too voluminous to be stated even in condensed form. It must suffice to state here that the transactions involved, so far as necessary, will hereinafter be referred to, and all of which are fully set forth in the complaint and in the several answers thereto.

The findings of fact are also very voluminous, and we shall refer to such parts only as are deemed essential to an understanding of the questions decided.

The evidence is likewise of immense volume, and in most instances we can do no more than merely state our conclusions therefrom.

The findings of the court, in substance, are: That in February, 1914, one H. P. Clark was indebted to the appellant in the sum of $50,000, and that he, on the 20th day of that month, executed and delivered to it five promissory notes of $10,000 each, whereby he promised to pay said sum of $50,000 on September 1, 1914, with interest at the rate of six per cent.; that to secure the payment of said notes Clark also delivered to appellant 29,089 shares of the capital stock of appellant, together with some other stock which is not in

issue here, and no further reference will be made thereto. Said promissory notes contain certain provisions to which, with a certain agreement which was delivered with said notes, more particular reference will be made hereinafter. The court also found that at the date said notes and agreement were delivered the market price of said 29,089 shares of stock "was from $1.45 to $1.57½ per share"; that thereafter, during the month of March, 1914, the market price of said stock advanced so that in small quantities some sold at $1.77½ and $1.80, and thereafter, up to the month of July, 1914, the same was sold in small lots for a still higher price; that immediately upon the receipt of said 29,089 shares of stock the appellant caused the same to be transferred on its books from the name of said Clark to the name of John Pingree as trustee, the same to be held as security for the payment of said notes; that on the 20th day of March, 1914, the board of directors of the appellant passed a resolution appointing a committee of three members of said board to request said Clark to deposit with said board additional security for the payment of said notes. The request to said Clark reads as follows:

"You are hereby notified and requested by this committee, in behalf of the company, to furnish to the company, within five days after this notice and request, such additional security as shall be satisfactory to, and approved by, the company. This request is made in accordance with the terms of the notes, and a copy, thereof is also addressed to you at your home address in Salt Lake City."

The court further found that no additional security was furnished, and that on the 1st day of April, 1914, a dividend of ten cents per share was declared on the capital stock of appellant, including said 29,089 shares, which dividend on said 29,089 shares was credited as part payment of the principal of said $50,000 indebtedness; that on May 4, 1914, one F. C. Ehman "made a written offer to the defendant corporation through the said John Pingree, its treasurer, of $50,000 for 29,000 shares of said" stock good for ten day; that thereafter, on May 26, 1914, said Ehman made a bid of $1.60 per share for said 29,089 shares of stock; that on May 27, 1914, the defendant Solon Spiro, who was the president of appel-

lant, on its behalf advised said Clark by letter that an offer
of $1.60 per share had been made for said 29,089 shares of
stock, and that the offer would be accepted unless the five
notes were paid "by the 5th day of June, 1914"; that on
June 15, 1914, Solon Spiro, on behalf of appellant, "tele-
graphed to Ehman that if he would renew his offer [of $1.60
per share] it would receive immediate attention"; that on
the following day said Ehman made a renewal of his offer
of May 26th by wire, good for ten days; that on June 17, 1914,
the board of directors (except L. R. Eccles, who was not
present) passed a resolution accepting the bid of said Ehman
of $1.60 per share for said 29,089 shares, and authorized the
president, Solon Spiro, "to deliver said shares to said Ehman
upon payment of the purchase price thereof," and directed
the treasurer to indorse the amount of the purchase price on
said notes, "and notified Mr. Clark of the action taken";
that on June 17, 1914, appellant "drew a sight draft on said
Ehman at Chicago, Ill., for $46,542.40," and deposited the
same with the stock certificates representing said 29,089
shares of stock in the Merchants' Bank of Salt Lake City;
that the appellant "received credit on its deposit account
with said bank for the amount of said draft, but said credit
was expressly made subject to payment of the draft, and
that said draft was not paid until the 14th day of July, 1914,
at which time the said stock certificates were delivered"; that
on June 17, 1914, the appellant canceled the certificates is-
sued to said Pingree, as trustee, and caused 29,089 shares
of stock to be transferred on its books to said Ehman; that on
June 18, 1914, appellant notified said Clark that said 29,089
shares of stock had been sold at $1.60 per share, and that the
proceeds thereof had been credited on said notes; that on
June 10, 1914, and before said stock was sold to said Ehman,
a dividend of ten cents per share was declared on the capital
stock of appellant, including the said 29,089 shares, which,
by the terms of the resolution declaring the dividend, was
made "payable to the stockholders of record on June 20,
1914"; that said dividend was paid on July 1, 1914, to the
stockholders of appellant, and the ten cents per share of

said 29,089 shares was paid to said Ehman; that "on July 8, 1914, the said L. R. Eccles borrowed from the defendant corporation [appellant] through said John Pingree, its treasurer, and G. W. Browning, its secretary, $45,000" which money was transmitted to said Ehman "for the purpose of being used in the payment of the defendant corporation's sight draft on said Ehman; that the said L. R. Eccles and said John Pingree knew of the said purpose and use of the said loan of $45,000, and were interested with the said Ehman in the purchase of said stock;" that the purported transaction between appellant and said Ehman "did not constitute a sale of said 29,089 shares * * * of stock," and said "purported sale was not made in good faith by the" appellant, and "said purported price was not the highest price reasonably obtainable" for said 29,089 shares of stock. The court also found that said 29,089 shares of stock were sold by said L. R. Eccles and said Ehman, and stated the dates when, the numbers of shares sold on each date, and the prices for which the shares were sold, and found that the total amount that was realized by Eccles and Ehman amounted to $60,233.32 exclusive of brokers' commissions. The findings also show that all of said 29,089 shares of stock, except 2,000 shares, which were sold October 31, 1914, for $1.50 per share, were sold from June 14, 1915, to and including October 30, 1915. All stock sold in 1915 was sold at a price slightly in excess of $2 per share. During the year 1914, however, the price of the stock fluctuated so that at times it sold for considerably less than $1.50 per share. There is also a finding that from October 1, 1914, up to and including April 1, 1918, dividends were declared and paid on the capital stock of appellant, including said 29,089 shares, amounting to $1.70 per share. The court also found that on July 21 (should be July 9), 1914, the respondent by letter notified the appellant that it repudiated the sale of said 29,089 shares of stock. That letter will be referred to again hereinafter. The court further found that the appellant was not prejudiced by plaintiff's delay in commencing this action, and exonerated the president of appellant, Solon

Spiro, from having had any knowledge of the transactions between Pingree, Eccles, and Ehman in the purchase of said 29,089 shares of stock from appellant, and found that he acted in good faith in the transaction complained of. The court also found that the respondent had notice of all of the matters of which Clark received notice, as hereinbefore stated.

Upon substantially the foregoing findings the court entered its conclusions of law to the effect that the sale of said 29,089 shares of stock to said Ehman was invalid; that the appellant remained the equitable owner of said stock until it was sold and transferred on its books to persons other than Ehman; that the ''conduct of Director John Pingree and Director L. R. Eccles constituted a gross fraud upon the plaintiff [respondent], and the knowledge of Director John Pingree touching the transactions, whether disclosed or not, are imputable to the defendant company [appellant] in so far as such knowledge was possessed by him during his participation in the proceedings of the board of directors of the defendant company''; that the appellant should be required to account for the amount that was realized for said 29,089 shares of stock by the said Eccles and Ehman, with interest from the respective dates of sale; that the appellant should also be required to account for the dividends that were paid on said 29,089 shares of stock as before stated, including the one paid to said Ehman, which was declared on June 10 and paid on July 1, 1914; that the several sales of said 29,089 shares of stock made by said Eccles and said Ehman as aforesaid ''are to be deemed the sales by the defendant company [appellant] under its power to sell given to it by H. P. Clark''; that in making such accounting the appellant is entitled to deduct the amount due on said notes with interest as provided therein. After an accounting was had, the court, after deducting the amount due on said notes, with interest, directed judgment to be entered in favor of respondent amounting to $33,349.42, and in case the appellant failed to pay said amount respondent was entitled ''to a deficiency judgment against the defendant John Pingree.'' Judgment was entered accordingly.

Appellant assails all of the foregoing findings in so far as they are adverse to it, and further insists that the court erred in all of the conclusions of law. We shall not refer to the assignments specifically, but shall consider them in solido.

Before proceeding to a consideration of the errors assigned it becomes necessary to recur to the conditions contained in the five promissory notes to which we have referred, and to the provisions of the agreement which was delivered with them, and which must be considered in connection with said notes. The said notes, after reciting that the 29,089 shares of stock were "deposited" as "collateral security for the payment of this note," proceed as follows:

" * * * And I hereby agree that if, in the sole judgment of the holder of this note, at any time prior to the maturity of this note, the collateral securities so deposited shall be deemed insufficient or inadequate to properly secure payment of this note at maturity, then and in such event, upon request of such holder, I will deposit with such holder such additional collateral security for the payment of this note as shall be satisfactory to, and approved by, such holder; and in case I shall fail to make such additional deposit within five days after such request, or in case I shall fail to pay any installment or part of the interest that shall fall due upon this note when and as same shall mature, or in case I shall fail to pay the principal of this note when same shall fall due and payable, then and in either or any such event the holder thereof may and is hereby authorized and empowered to at once sell for cash to the highest bidder, either at public sale or private sale, or in the sales room of any public mining or stock exchange or curb market where such securities are ordinarily dealt in, all said collateral securities so herewith or hereafter deposited, or so many or much thereof as necessary, for the purpose of paying this note, and shall deliver the securities thus sold to the purchasers thereof, and shall apply upon and toward payment of this note the moneys thus realized, after deducting the usual commissions on, and expenses of, sale, and the necessary and reasonable attorney's fee, if any, incurred, redelivering to me any surplus of such net proceeds of sale, and any surplus of said securities not so sold, remaining on hand after payment and satisfaction of this note in full; and I agree that the holder of this note, if the highest bidder, may purchase any of said collateral securities at any such sale, and that any such sale may be made without previous demand of payment of this note, and without any notice of any kind whatsoever to me or my assigns or to the

public of the intent to make, or of the time, place, or purpose of making, the sale, and without any notice of any kind to me or my assigns respecting any redemption of said or any of said collateral securities prior to such sale."

The agreement which was delivered in connection with said notes and as a part of the transaction, so far as material here, reads as follows:

"Irrespective of the terms, provisions, conditions, and agreements contained in said notes, and without in any way modifying or altering the form or the legal effect thereof, I further agree, in consideration of your acceptance of said notes, that at any time or times prior to the maturity of any or all of said notes you may, at your option, sell, and you are hereby fully authorized and empowered to so sell, at your option, any or all of the 29,089 shares of the capital stock of your company deposited by me with you as part of said collateral security, by any method of sale, and without any previous notice to me, at any price not less than $1.50 per share, and out of the purchase moneys when received you will first deduct and pay regular commissions on such sales, and apply the remainder of the purchase moneys toward payment of said notes. You are not charged by me with any duty or obligation, however, to so sell any of said shares at said price or at any higher price. If, after the five notes are fully paid and satisfied according to their terms, any of the shares of stock deposited with you as collateral security for the payment thereof shall remain unsold, you are hereby ordered and directed to deliver same to the Western Securities Company, a corporation, of Nevada. I shall immediately hereafter assign and transfer same to said Nevada corporation."

Both the notes and the agreement were signed by H. P. Clark. We remark that at the trial it was stipulated that although the respondent claimed that it was the owner of said 29,089 shares of stock when it was deposited it was, nevertheless, conceded that said Clark had full authority to deposit the same, and, in so far as the indebtedness to appellant is concerned, said stock was pledged as security for the payment of said indebtedness, and was subject to sale the same as though the stock belonged to Mr. Clark. In this opinion the stock will be treated as having been the property of Clark at the time it was deposited.

It will be observed that both in its findings of fact and conclusions of law the court practically ignored the power

which was conferred upon appellant to sell the 29,089 shares of stock. The court, it seems, took the position that inasmuch as the sale was made to Ehman through the knowledge, and what might be termed the connivance, of Director Pingree and Director Eccles, the knowledge and connivance of these two directors tainted the whole transaction to the extent of vitiating the sale of the stock. The court's findings in that regard are reflected in his opinion filed after the evidence on the main case was all before it and before the accounting was had. In the course of that opinion it is said:

"On May 27th Ehman bids $1.60 per share for the stock, and on June 17, 1914, this bid is accepted by the company and the stock is sold to Ehman. None of the directors at this time except Pingree (and presumptively Eccles) knows about the higher bid of $50,000.00 made in letter of May 4th to Pingree. Here Pingree was acting for the company. Was concealment of the higher bid an act of good faith?

"I am of the opinion that the entire proceeding to sell the stock was voidable because of the adverse interest and self-serving intent of at least two directors at a time they were acting in direct contact with plaintiff's interests in the transaction. It is difficult to measure the exact force and influence of such intent. In fact, it need not be measured. All the remaining directors may say, and truthfully say, that they acted honestly, yet such a campaign as Pingree and Eccles conducted might and probably did include some well-planned and subtly concealed propaganda among directors to deceive them. The suppression of the first bid, failure to disclose interest, and failure to disclose facts, make such propaganda. The fact that it might contain plans to influence directors, and might have in any wise changed the color of things, is enough, in the absence of countervailing circumstances, to taint the proceedings with suspicion.

"Some directors of conceded intelligence and integrity were asked if they acted according to their best judgment, etc., and they answered, 'Yes.' Suppose the question had been: 'If you knew that Mr. Pingree had received a higher bid, knew that he and Eccles hoped to profit by means of this sale, and knew that plans were afoot among them to juggle the finances of the company to raise funds to perform this act, would you have voted to accept the bid?"

"In these transactions wherein he was attending to the passage of resolutions and acting in matters forwarding the sale, Pingree was the agent of the company. In all matters where he

acted concerning the matter, he was, as between Clark and the company, the agent of the company and the company."

The sole ground upon which the court's legal conclusions are based is that Pingree and Eccles, by virtue of their offices, represented the appellant in the transactions leading up to, and culminating in, the sale of the stock to Ehman. Further, that Pingree, in making the loan of $45,000 to Eccles and in receiving the $50,000 bid for the stock from Ehman, acted as the agent of the appellant, and hence it is bound by his acts, although none of the other members of the board of directors had any knowledge of the transaction between Pingree, Eccles, and Ehman, and did not know that Eccles participated in the purchase of the stock nor had any knowledge of the fact that Pingree had loaned Eccles the $45,000 at the time the stock was purchased by Ehman.

Before proceeding to a review of the law, it is necessary to call attention to some parts of the evidence. It is very clear to our minds that the bid for $50,000 was made to Pingree upon his request, and that he concealed the fact from the board of directors and alone knew of it; that he purposely suppressed the bid, and thereafter advised Mr. Ehman, who lived at Chicago, and who was a friend of Pingree's and a stockholder of appellant, to make a bid for $1.60 per share to Mr. Spiro as the president of appellant. It is only fair to state here, in justification of Pingree's conduct, that he testified for the plaintiff, and in his testimony explicitly states that he thought that $1.60 per share was a fair price for the stock under the conditions then prevailing. Further, the evidence is without contradiction that when the bid for $1.60 per share was received the board of directors, through the president, solicited bids from the leading firms of stockholders in Salt Lake City, and through other sources sought information respecting the price said stock could be sold for by selling the 29,089 shares in one block, and that the information they received was all to the effect that, in view of all the circumstances and the conditions of the mine (which they personally inspected at about that time), the bid of $1.60 per share was not only a fair and reasonable bid, but

that it was as high a bid (perhaps higher) as any that could be realized for the stock if sold upon the stock exchange. They also were informed that neither of the several firms of stockbrokers had any client or clients who were willing to purchase said 29,089 shares of stock at a higher price or even for the price bid by Ehman. The evidence is also overwhelming that the causes which were operative in advancing the price of the stock during the year 1915 were unknown at the time the sale was effected, and that ninety-five per cent. of the ore which was obtained from said mine during and after the month of June, 1914, when said stock was sold, and up to the time this action was commenced, was discovered, developed, and mined after the stock had been sold. It was also made to appear without conflict that nearly all of the dividends that had been paid prior to June, 1914, were paid from the proceeds of a judgment which had been paid to appellant, and of which there remained on hand in June, 1914, nearly $250,000, which was subsequently paid out in dividends. It was also shown that the president of the appellant obtained the written opinion of one of the leading and one of the most reputable attorneys of Salt Lake City, and, in his absence, also obtained the opinion of one of the leading attorneys of Ogden, before accepting the bid for $1.60; that both of the opinions are to the effect that in view of the then existing conditions and the unstability of the market price of the stock, and in view of the powers conferred by Clark upon appellant, it would be unwise to reject said bid, all of which facts were made known to the board of directors, and in the resolution accepting the bid and authorizing the president to complete the sale of the stock all of the foregoing facts are recited, and were thus known to all of the directors. It was for the reason that time was required to obtain the information sought by the president that Ehman's bid could not be accepted within the ten-day limit imposed by him, and that the president informed him that, if he would renew the bid, it would be accepted. It was also conclusively shown that none of the board, except Eccles, nor the appellant, ever received a farthing out of the proceeds of the sale of the

29,089 shares of stock, and had no part or share in the transactions relating thereto, except under the authority conferred in the notes and the accompanying agreement. It was also shown that, although Pingree expected to receive something from Ehman and Eccles, no agreement to that effect between them ever was entered into and that he received nothing.

The court based its decision for an accounting, and especially its conclusions of law, upon the fact that in view that Pingree was a director, and in view that he took part in, and in a large measure secretly directed, some of the steps leading up to the sale of the stock to Ehman, and although his interests in that regard were adverse to the interests of the appellant, he, nevertheless, represented it, and hence it is bound by his wrongful acts.

The law is well settled that, in case a director, officer, or agent of a corporation transacts business in which he is adversely interested, his knowledge respecting the particular transaction (except under special conditions to **1** which reference will be made later) is not imputable to the corporation, and hence it is not liable for his acts. The general rule is stated in the headnote to the case of *Victor G. & S. M. Co.* v. *National Bank,* 15 Utah, 391, 49 Pac. 826, as follows:

"* * * When any officer of a corporation is acting partly for himself and partly for the corporation, notice to him will not affect the rights of the company."

The rule as stated is perhaps not sufficiently guarded to make it applicable to all conditions. The following well-considered cases are in point upon this proposition: *E. S. Woodworth & Co.* v. *Carroll,* 104 Minn. 65, 112 N. W. 1054, 115 N. W. 946; *Aycock Bros.* v. *First National Bank,* 54 Fla. 604, 45 South. 501; *Schneider* v. *Sellers,* 98 Tex. 381, 84 S. W. 417; *Oregon & C. R. Co.* v. *Grubissich,* 206 Fed. 577, 124 C. C. A. 375; *Weber* v. *Richardson,* 76 Or. 286, 147 Pac. 522; *Teagarden* v. *Godley Lumber Co.,* 105 Tex. 616, 154 S. W. 973.

In *E. S. Woodworth & Co.* v. *Carroll,* supra, it is said:

"The doctrine that a principal is chargeable with notice of facts known to his agent is based on the ground that it is the duty of the agent to communicate his knowledge to the principal, and that it is to be presumed that he has performed this duty. Ordinarily this presumption is conclusive. The reason of the rule ceases, however, where the agent is dealing with the principal for his own purposes, or where for other reasons his interest is adverse to that of the principal, so that it is to his own advantage not to impart his knowledge to the principal. It is accordingly well settled in the law that a corporation is not chargeable with notice of facts because of knowledge on the part of the officer or agent, where the officer or agent is dealing with a corporation in his own interest, and where for other reasons, his interest is adverse to that of his corporation, so that communication of knowledge by him cannot be presumed."

In 4 Fletcher, Cyc. Corps. section 2243, the author, in discussing the doctrine, says:

"It is well settled, therefore, as a general rule, that (1) where an officer is dealing with the corporation in his own behalf, or (2) is, for any other reason, interested in a transaction adversely to the corporation, knowledge possessed by him in the transaction is not imputable to the corporation."

Referring to a transaction somewhat similar to Ehman's bid to Pingree of $50,000 for 29,000 shares of stock, which bid was not communicated to the board of directors by Pingree, and which was not solicited for the company, Mr. Fletcher, in vol. 4, section 2232, at page 3459, says:

"On the other hand, whether or not a corporation is chargeable with notice of facts as to which individual directors have knowledge is not entirely clear, and the decisions on the question are conflicting. By the great weight of authority, however, since the directors do not individually represent the corporation, and have no power to bind it, except collectively and as a board, notice of facts casually acquired by individual directors, when they do not communicate their knowledge to the other directors or officers, and do not act officially in the matter, is not notice to the corporation."

The principle stated in the foregoing excerpts is peculiarly applicable to the power of corporate directors under our statute. See *Gay* v. *Merc. Inst. et al.*, 37 Utah, 287, 107 Pac. 237; *Lochwitz* v. *Mining Co.*, 37 Utah, 349-355, 108 Pac. 1128.

While there may be cases where the facts are in dispute as

to whether the officers acted officially or acted as the authorized agents of the corporation where it may not be easy to determine the question of notice, yet in the case at bar there are no such complications. Pingree had no authority either to solicit or to receive bids for the stock, and he acted as a volunteer merely. Nor in his communications to Ehman did he act, or pretend to act, for the appellant. Indeed, he advised Ehman to direct his bid for $1.60 per share to the appellant, which was done. To hold that appellant had notice of the $50,000 bid under the evidence in this record, taking it most favorably for the plaintiff, might spell ruin to every corporation in this state, since any director could volunteer to interfere in any transaction which was intrusted to others. Pingree not only acted adversely in what he did, but he acted without authority, and merely as an individual. The general rule is also well stated in 3 Clark & Marshall, Private Corps. section 723, commencing at page 2210, where the author says:

"By the weight of authority, if a director is acting for himself and adversely to the interests of the corporation, in a particular transaction, as in a case in which he procures a note to be discounted by the corporation, or sells or pledges property to it, his knowledge of facts is not imputable to the corporation; *and it is immaterial that he was present at a meeting of the directors at which the transaction was considered and authorized.*" (Italics ours.)

See, also, 7 R. C. L. section 659, p. 657.

. Respondent's counsel, however, insist that both Pingree and Eccles acted in their official capacities in the transaction with Ehman, and hence their knowledge was imputable to appellant. They further insist that, although their interests were adverse to that of appellant, in view that appellant was also interested in the transaction in which both Pingree and Eccles acted officially, the acts of both came within the qualifications of the rule that the knowledge of an officer who is adversely interested in the transaction is not imputable to the corporation. While the decisions are not in complete harmony respecting the application and the qualification of the rule contended for by counsel, yet the real distinction

between the general rule and the qualification thereof is well defined. It has accordingly been held that in case the business or transaction in question is intrusted to an officer or agent of the corporation who acts as its only authorized agent, then, although such officer in transacting the business acts for himself or is interested in the transaction adversely to the corporation, nevertheless, under such circumstances, his knowledge is imputable to the corporation for the reason that the officer is necessarily acting for the corporation in his official capacity and as its sole authorized agent, and hence his knowledge must be imputed to his corporation. "The authorities," says Mr. Justice Carson of South Dakota (in *National Bank of Commerce* v. *Feeney,* 9 S. D. 550, 70 N. W. 874, 46 L. R. A. 732), "recognize a marked distinction between cases where a cashier not only acts for himself, but also as such cashier, and cases where the person, though cashier, acts for himself only, or for a firm of which he is a member, and the corporation is represented in the transaction by other officers. In the latter cases the knowledge of the cashier is not imputed to the bank." See, also, 4 Fletcher, Cyc. Corps, section 2251.

In *Mutual Invt. Co.* v. *Wildman,* 182 Ill. App. 137, the court, after referring to the general rule that where an officer acts for himself or is adversely interested in the transaction his knowledge is not imputable to the corporation, at page 144 says:

"There are several well considered cases which recognize a qualification to said exception to the general rule, viz. where the officer of the corporation (though he also acts in his own interest or the interest of another corporation) is the sole or an essential representative of the corporation in the transaction in question, in which event his knowledge is held to be imputable to the corporation."

If we now take the case at bar as an example, the fact is that the board of directors had committed the matter of disposing of the stock to a committee of three, of which neither Pingree nor Eccles was a member, and authorized Spiro to consummate the transaction of selling the stock to Ehman, and he alone was its representative in that matter.

If Mr. Spiro, in completing the transaction, had thus acted adversely to the interests of appellant, his knowledge would, nevertheless, have been imputable to it, since in the transaction he necessarily represented the appellant in his official capacity or as its authorized agent. Pingree at no time and under no circumstances was authorized to sell or dispose of the stock, or to receive any bids therefor, or to lend any money, or to do anything in connection therewith, except as he was directed by the board of directors; and hence all he did in obtaining the bid from Ehman and in communicating with him he did as a volunteer, and as he supposed, for the benefit of himself, Ehman, and Eccles. We have already shown that the fact that he acted as director in accepting the bid from Ehman for $1.60 in no way changed the general rule, namely, that his knowledge was not imputable to appellant.

We have carefully read the cases relied on by counsel for respondent upon the foregoing propositions, namely: *Guerrero* v. *Ballerino,* 48 Cal. 118; *McKenney* v. *Ellsworth,* 165 Cal. 326, 132 Pac. 75; *Bank of Pittsburgh* v. *Whitehead,* 10 *Watts* (Pa.) 397, 36 Am. Dec. 186; *Le Duc* v. *Moore,* 111 N. C. 516, 15 S. E. 888; and *Holden* v. *New York & E. Bank,* 72 N. Y. 286. Without pausing to review those cases, it must suffice to say that the decisions are not controlling. Indeed, they cannot even be seriously considered, in view of the facts and circumstances of the case at bar. The conclusion is therefore inevitable that under the law the knowledge of Pingree in his transactions with Ehman was not imputable to appellant; and what is true with respect to Pingree is, for a stronger reason, true with respect to Eccles.

The court committed manifest error, therefore, in its conclusion of law wherein it found that the sale of the 29,089 shares of stock to Ehman was invalid because of the "conduct of Pingree and Eccles."

There is, however, still another reason why the sale of the 29,089 shares of stock was valid as against both Clark and the respondent. The agreement between Clark and appellant was that "* * * if, in the sole judgment" of ap-

pellant, "at any time prior to the maturity" of the note, "the collateral security so deposited shall be deemed insufficient or inadequate to properly secure payment of this note at maturity, then in such event, upon request of such holder [appellant], I will deposit with such holder such additional collateral security for the payment of this note as shall be satisfactory to, and approved by, such holder; and, in case I shall fail to make such additional deposit within five days of such request,  *   *   *   the holder hereof may, and is hereby fully authorized and empowered to, at once sell for cash to the highest bidder, either at public sale or private sale, *   *   *   all said collateral securities so herewith or hereafter deposited  *   *   *; and I agree that the holder of this note [the appellant], if the highest bidder, may purchase any of said collateral at any such sale, and that any such sale may be made without previous demand of payment of this note, and without any notice of any kind whatsoever to me or my assigns or to the public," etc.   In the agreement before referred to it is further provided that, in addition to all that has been stated, the appellant may "at your option sell, and you are hereby fully authorized and empowered to so sell at your option, any or all of the 29,089 shares of the capital stock of your company deposited by me with you as part of such collateral security, by any method of sale, and without any previous notice to me, at any price not less than $1.50 per share.  *   *   *"   The evidence discloses without conflict that Mr. Clark, who executed the foregoing agreement, had not only for years been a banker and had thus constantly dealt with collateral securities and pledges, but that he was also a lawyer who had been admitted to the bar.   He thus must have fully appreciated the terms and conditions of the notes and agreement.   As before pointed out, the sale was not only made within the power conferred, but it was not made until Mr. Clark had been given ample notice that it would be made and the price that would be paid for the stock; and the court specially found that the respondent received notice of those matters.   Moreover, the appellant, through its president, sought and obtained both legal and

expert advice respecting the reasonableness of the price offered and the legality of the sale under the powers conferred. In view of all the circumstances, it is not easy to perceive how Pingree and Eccles were guilty of fraud in having Ehman submit a bid of $1.60 per share for the 29,089 shares of stock. The appellant was clearly given the right to purchase the stock if it was the highest bidder therefor, and, under the special agreement, in addition to that right it was authorized to sell said stock to any person "at any price not less than $1.50 per share."

The law certainly is to the effect that a pledgee may bid at his own sale if so authorized by the pledgor. 4 Thompson, Corps. (2d Ed.) section 4276. Moreover, the appellant was authorized to sell the 29,089 shares "at any price not less than $1.50 per share." If, therefore, it could have sold the stock at that price, it, under the power, could also have purchased it at that price, provided that price, in view of all the circumstances, was a fair and reasonable one. If, therefore, the appellant could have purchased the 29,089 shares of stock without violating any law or any of the provisions of the power conferred upon it, we cannot conceive how Ehman as a stockholder committed any wrong in bidding for and in purchasing the stock at $1.60 per share, provided that price was a fair and reasonable price under all the circumstances. Nor can we see how the information he obtained from Pingree could vitiate the transaction. It certainly is strange doctrine that if a corporation as pledgee may bid and may purchase the pledged property for any amount within an agreed price, that it constitutes fraud and vitiates the sale if one of the stockholders of such corporation, or even a director, purchases at that price. If the price of $1.60 would have been a fair and reasonable price in case appellant had exercised its right to purchase the stock, why is it less so if Ehman purchased it? All that the appellant was obligated to do in selling the stock was to sell it "for the best price it could obtain." Jones, Collateral & Pledges (3d Ed.) section 732. In section 735 of the same volume the author says:

"As regards the price obtained at a sale made under a power to sell without notice, the mere fact that the price obtained is less than the market price at the time does not alone make the pledgee liable for the difference. It must appear that there was an intent to injure the pledgor, or that there was such reckless- ness shown, in the mode or time of selling, that such intent might be inferred."

The difference referred to by the author is the difference between a fair and reasonable price and the price the stock was sold for if sold for less than that price.

At all events, if the price of $1.60 per share was not the best price that could have been obtained for the stock it would not vitiate the sale, but the appellant would at most be liable for the difference between what it could have obtained and what it did obtain for the stock. Thompson, Corps. (2d Ed.) section 4275.

If it be assumed, however, that the sale was void and that appellant was guilty of conversion of the stock, the judgment is, nevertheless, contrary to law. The ordinary rule govern- ing the measure of damages in cases where the pledgee wrong- fully converts the property pledged is the market value of the property pledged with interest from the time it was converted. If the pledged property consists of stocks or bonds of a fluctuating market price, then the measure of damages, under the New York rule, is the highest market price of such stocks or bonds within a reason- able time after the pledgor obtained notice of the sale of the stock or bonds which was illegally made. While the question is not directly involved here, yet it is manifest that the dis- trict court gave that matter no consideration. True, the court found that the appellant was not prejudiced by re- spondent's delay in bringing the action. That, however, is not the question here. The question is one of the measure of damages, and of the time at which such damages should be fixed, and not a question of commencing an action. Where the damages are limited as just stated, an action may be brought at any time within the period of the statute of limitations. The time given under the New York rule is fair and just to all. As soon as a pledgor receives notice that

a pledgee has converted his stocks or bonds, he may go into the market and replace them, or, if he so chooses, he may rely on his damages. He must, however, act within a reasonable time, and cannot by his own will extend that time. This case affords a striking illustration of the fairness of the rule. The evidence is to the effect that the price of the stock declined after the sale in question was made. The respondent might thus perhaps have purchased the same quantity of stock at a lower figure than it was sold for, and thus might have received all the dividends. If, however, it was unable to do that, or from choice refrained from doing that, it had the right to recover the highest market price of the stock within a reasonable time after it received notice of its sale, if it deemed the sale invalid, and thus would have received all that the law allows. The price of the stock being subject to constant fluctuations, respondent had to act within a reasonable time to replace the same or be limited to such a time in determining its damages. This court is committed to the principle that under such circumstances the one claiming to be injured must act within a reasonable time and with diligence. *Hatch* v. *Lucky Bill Co.,* 25 Utah, 405, 71 Pac. 865; *Raht* v. *Mining Co.,* 18 Utah, 290, 54 Pac. 889. These cases are not cited here as being controlling, but merely for the purpose of illustrating the principle that is applicable in actions for the recovery of property the price or value of which is constantly fluctuating.

In Bowers, Law of Conversion, section 657, the measure of damages in the several jurisdictions under circumstances like those in this case is discussed, and it is there stated that Utah is one of the jurisdictions wherein the New York rule has been adopted. That rule is the rule which has been adopted by the Supreme Court of the United States in the case of *Galligher* v. *Jones,* 129 U. S. p. 201, 9 Sup. Ct. 335, 32 L. Ed. 658. That case was appealed to the Supreme Court of the United States from the territory of Utah. See 3 Utah, 54, 1 Pac. 15. *Galligher* v. *Jones* is referred to with approval in a later case decided by this court, namely, *Walley* v. *Deseret National Bank,* 14 Utah, 315, 47 Pac. 147. The

cases are collated by Mr. Bowers, and it is not now necessary to pursue the question further.

While it is true that the conduct of the wrongdoer and the circumstances of the particular case may be such that a court of equity will require the wrongdoer to account for the property and for the profits derived therefrom, yet the facts and circumstances of this case do not justify such a result. Moreover, it is not easy to understand why the innocent stockholders of appellant should be required to account for what was exclusively received by Eccles and Ehman. Neither the law nor equity favors vicarious responsibility.

Moreover, in our judgment, appellant not only made all reasonable effort to obtain a fair and reasonable price for the 29,089 shares of stock, but obtained such a price. In this connection it is important to keep in mind the fact that Mr. Clark, who for years was the treasurer of the appellant, and acted in that capacity only a short time before the delivery of the notes in question, and was familiar with all of its affairs and had every opportunity and means of knowing the condition of the mine and the value and price of the stock, nevertheless, in the agreement, expressly stipulated that the stock might be sold at $1.50 per share. He must have considered that a fair price for the stock at the time. While it is true that the price advanced somewhat after the agreement was delivered and before the stock was sold, it is also true that after June, 1914, the price again declined, and Eccles and Ehman sold some for $1.50 a share during 1914. We have already pointed out the efforts of appellant in obtaining information from the Salt Lake stockbrokers. Moreover, one of the leading stockbrokers of Salt Lake City, at the trial, quoting from the bill of exceptions, testified: "As far as the company had decided to sell the stock, I consider the acceptance of a dollar and sixty cents a share in one block as fair a price as they could have obtained, a better price than they could have obtained if they had sold it on the market." That evidence is undisputed.

Nor, in our judgment, can any case be found where, under

the circumstances disclosed in this record, it was held that the sale of stock at the price it was sold was so grossly inadequate as to vitiate the sale. If it were held that sales of pledged or mortgaged property must be made at the actual market price of such property, few, if any, such sales could be permitted to stand. Where property is sold under a power of sale the law requires that the price obtained must be a fair and reasonable one, in view of all the circumstances, and not that the property must be sold at the precise figure that similar property is sold for upon the market or between dealers. The latter price is rarely obtainable for reasons known to all, which need not be stated here. For the reasons just stated the rule quoted from Jones on Collateral Securities, etc., governs such sales. Good faith, reasonable diligence, and proper effort on the part of the pledgee to obtain a fair and reasonable price for the property, is always required unless the pledgor directs the sale to be at a stipulated price.

In no view that can be taken, therefore, can the judgment in this case be sustained.

Nor is there any merit in the contention that the sale was made too hastily in view that the stock was sold before the debt became due. The authorities hold that where power is given to sell before due, the sale may take place before that event arrives.

Nor is the contention tenable that there was no adequate cause for appellant to consider the stock as insufficient security. The law applicable to the sale of mortgaged chattels (and the rule is applicable here) is that, in case the mortgagee is authorized to take possession of and sell the property when he deems himself insecure, his judgment, if exercised in good faith, controls. The Supreme Court of Kansas in *Thorp* v. *Flemming*, 78 Kan. 237, 96 Pac. 470, has so held. The decision of the court is correctly reflected in the first headnote, which reads:

"Under a clause in a chattel mortgage providing that the mortgagee may take possession of the property if he deems himself insecure, it is immaterial whether the mortgagee has good cause

to believe that he is insecure, if he in fact deem himself to be so."

To the same effect is Jones on Chattel Mortgages (5th Ed.) section 431, where the cases are collated.

There is, however, another question which presents more difficulty. As hereinbefore stated, the appellant declared a dividend of ten cents a share upon all of its capital stock, including the 29,089 shares, on the 10th day of June, 1914, to be participated in by all stockholders of record on the 20th day of June, and made payable to them on the 1st day of July, 1914. Respondent contends that the dividend declared on June 10th should have been credited on Clark's notes regardless of the date it was made payable, and hence in paying that dividend to Ehman, who purchased the stock after that dividend had been declared, the appellant was guilty of conversion.

Comp. Laws Utah 1917, section 87, after providing the effect of a sale and transfer of stock between seller and purchaser, and the effect as it relates to the creditors of the parties, provides as follows:

"Provided, that for the purpose of voting, and of receiving dividends, and of levying and collecting assessments, and wherein the corporation is otherwise interested, the holder of record, as shown by its books, shall be treated and considered as the holder in fact, and the tranferee shall have no rights or claims as against the corporation until transfer thereof be made upon the books of the corporation or a new certificate be issued to him."

The general rule, so far as we know, in the absence of a statute to the contrary, which is enforced by the courts, is that the dividends belong to the stockholder who owns the stock at the time the dividend is declared, and, although he parts with his stock after the dividend is declared and before it is paid, he nevertheless, is entitled thereto unless he has assigned or disposed of the dividend with the stock or independently thereof. The mere sale and transfer of the certificates of stock after a dividend is declared does not carry with it the dividend. One of the cases to which frequent references is made in the decisions is the case of *Hopper* v. *Sage*, 112 N. Y. 530, 20 N. E. 350, 8 Am. St. Rep. 771. In the course of the opinion it is said:

"The declaration of the dividend is in legal contemplation a separation of the amount thereof from the assets of the corporation, which holds such amount thereafter as the trustee of the stockholder at the time of the declaration of the dividend. In the absence, therefore, of any provision in a contract of sale and purchase of stock, outside of and not subject to the rules of the Stock Exchange, the law declares that such a contract gives the dividends to the owner of the shares when the dividends were declared."

In the case of *Clark* v. *Campbell,* 23 Utah, 569, 65 Pac. 496, 54 L. R. A. 508, 90 Am. St. Rep. 716, the rule is stated in the headnote thus:

"Dividends declared on corporation stock belong to the persons owning the stock at the time the dividends are declared."

In the Clark Case the decision in the case of *Wheeler* v. *Sleigh Co.,* (C. C.) 39 Fed. 347, which contains a very clear and convincing statement of the rule, is quoted from at length and approved. To the same effect is *Stell* v. *Island Milling Co.,* 47 Or. 293, 83 Pac. 782, and many other cases that might be cited. In 10 Cyc. p. 557, the rule is stated in the following language:

"A dividend when declared becomes the separate property of the shareholder, and wholly disconnected from his shares. It therefore does not pass with a subsequent transfer of the shares, unless the contract of transfer expressly so provides. And this is so without reference to the date at which the dividend is made payable, for it is the declaration of the dividend that creates the segregation and establishes the debt from the corporation to the stockholder."

"It also results from the foregoing that, in the absence of any provision to the contrary in the contract for the sale or transfer of the shares, a dividend declared previously to such sale or transfer belongs to the seller of the shares, although, for the convenience of the company, it may be made payable thereafter.

"A custom of brokers by which dividends declared, but not paid, belong to the purchaser of shares, is not admissible to alter the legal rights to such a transaction, as fixed by the foregoing rules."

In 2 Clark & Marshall, Private Corps. in referring to the rights of pledgees to the dividends, the authors, at page 1611, state the rule as follows:

"In the absence of agreement to the contrary, a pledge of shares of stock as to collateral security carries with it, as an incident of the pledgee's special ownership, the right to receive dividends afterwards declared, to be applied on the debt, or held in trust for the pledgor; and if the transfer has been registered on the books of the corporation, or, although not so registered, if the corporation has notice thereof, it will be liable to the pledgee if it pays such dividends to the pledgor."

Numerous cases are cited in support of the texts we have quoted from Cyc. and from Clark & Marshall.

Under the law, therefore, appellant was entitled to the dividends that were declared on the stock during the time it remained in pledge, and it necessarily follows that it received such dividends as a trustee for the benefit of the pledgor of the stock, and was bound to account for them, and to credit the amount of the dividends upon the debt to secure which the stock was pledged. While it may be that under a statute like ours, as between the stockholders, the corporation may be protected in paying the dividends to the registered holder of the stock at the time the dividend is paid in the absence of notice to the contrary (2 Clark & Marshall, Private Corps. p. 1016), yet such an excuse is manifestly not available to the appellant in this case. The appellant, as pledgee, was required to obey the law, and it could not, as between it and the pledgor of the stock, change the law nor its duty by adopting a resolution that the dividend should be applied otherwise than the law directed without the permission or consent of the pledgor. The law imposed upon it the duty of applying all dividends which were declared before the stock was sold upon the debt secured by the stock, and if it failed in that regard it is liable to the pledgor for the amount of the dividends otherwise applied. The dividend which was declared June 10, 1914, was declared several days before Ehman's bid was accepted and the stock sold to him, and therefore clearly did not pass with the stock to him. We are forced to hold, therefore, that in paying that dividend to Ehman appellant transcended its rights under the law. It is therefore liable to the respondent for the amount of the dividend de-

clared on June 10, 1914, with legal interest thereon.

In view of what has been said there is no merit to respondent's cross-appeal and its cross-assignments of error, and it is not necessary to consider that phase of the case.

For the reasons stated the findings of fact, conclusions of law, and judgment must be vacated and reversed. The cause is therefore remanded to the district court of Salt Lake county, with directions to vacate its findings of fact and conclusions of law, and to make findings of fact and conclusions of law in conformity with the views herein expressed; to enter judgment for respondent for the amount of the dividend declared on June 10, 1914, with legal interest thereon. The findings of fact and conclusions of law,. so far as they are not modified herein, are sustained, and the judgment dismissing the action against the defendant Spiro is affirmed.

In view of the facts and circumstances of this case, we feel constrained to hold that one-half of the costs of this appeal be paid by each party, and that appellant may have its portion deducted from the judgment hereby directed to be entered in respondent's favor.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.

### On Application for Rehearing.

FRICK, J.

Counsel for respondent have filed an application for rehearing in which they set forth seven reasons why the application should be granted. Six of those reasons are fully covered in the opinion, and in view that nothing new is presented, nor a single authority cited in support of their contentions, we refrain from discussing those matters further. As a seventh reason counsel now urge that respondent is entitled to four dividends of ten cents each; that is, three in addition to the one to which, in the opinion, we held that it is entitled.

The claim, however, being now made for the first time on the application for a rehearing, for that reason alone we might refuse to consider it. In that behalf it is urged that, in view that the trial court determined the case upon a different theory, the matter now presented did not receive proper attention. Counsel, in our judgment are in error. The trial court expressly found the dates on which dividends were declared and the amounts thereof.

From the findings, none of which has been assailed, it appears that respondent is entitled only to one of the four dividends which it now claims, and that one has been allowed to it by this court. It is, however, contended that the dividends now claimed were all declared at one time and not at the several times found by the court. That contention is manifestly untenable. If counsel's contention should prevail, then every stockholder who sold his stock after the date on which it is now contended the four dividends were declared in one resolution, unless he expressly assigned or sold the dividends, would be entitled to them on precisely the same grounds that it is contended respondent is entitled to them. The record is replete with facts and statements from which it is manifest that all who dealt in the stock regarded the dividends to have been declared and made just as the court found they were, and considered those transactions closed. To now accede to counsel's contention might lead to interminable litigation upon matters which all considered closed.

Even though the matter should be reopened as counsel desire, yet the resolution upon which they rely does not admit of the construction they place upon it. Nor do the cases cited in support of their contention, namely, *Cogswell* v. *Second Nat. Bank,* 78 Conn. 75, 60 Atl. 1059 (affirmed under the title of *Jerome* v. *Cogswell,* 204 U. S. 1, 27 Sup. Ct. 241, 51 L. Ed. 343) ; *Northwestern Marble Co.* v. *Carlson,* 116 Minn. 438, 133 N. W. 1014, Ann. Cas. 1913B, 552; and *Redhead* v. *Iowa Nat. Bank,* 127 Iowa, 572, 103 N. W. 796—so hold. We have examined all of the foregoing cases, with

others, and none of them has any bearing upon the question as it is now raised on the application for rehearing.

It is perhaps not improper to add here that we have again carefully considered all of the phases of the matters in controversy in this case, and we are fully persuaded that, in view of all the facts and circumstances, the conclusion reached is sound, and it is adhered to. The petition for a rehearing is therefore denied.

CORFMAN, C. J., and WEBER, GIDEON, and THURMAN, JJ., concur.