JOHN A. O'CONNOR, Respondent, Appellant, *v.* G. EDWARD GRAFF and WILLIAM E. GILMORE, Appellants, Respondents.

Third Department, January 8, 1919.

Partnership — limited partnership — failure to file certificate in county where branch office maintained — principal and agent — action against stockbroker for conversion of stocks sold without notice to purchaser on margin — evidence — estoppel — duty of purchaser of stock on margin to inquire of broker with reference thereto — damages — determination of time for fixing value of converted stock.

The failure of a firm of stockbrokers to file or even attempt to file its certificate of limited partnership as required by section 30 of the Partnership Law, or a copy thereof, in a county where it maintains a branch office, renders a member of the firm liable as a general partner upon transactions through said office, although said certificate has been filed in the county where it maintains its home office.

One who seeks to escape the liability of a general partnership must at his peril comply strictly with the provisions of the statute. There must be a substantial *bona fide* effort to comply with the substance of the mandatory requirements.

In an action for conversion to recover the value of stock purchased on margin by the plaintiff from the defendant stockbrokers and held by them as collateral for sums advanced, it appeared that the stocks had been sold by the defendants without notice to the plaintiff and without demand of further margins and at a time when the plaintiff owned a substantial equity therein; that the defendants upon closing their branch office, through which the stocks had been purchased, transferred them to another company.

*Held,* that the evidence was insufficient to establish that the plaintiff was ever advised or had reason to suppose that another company had been intrusted with carrying his stock or that he knew it was being carried under a fictitious name, and that, therefore, he is not estopped upon such grounds from making a claim against the defendants.

The Stock Exchange being closed for several months and the plaintiff at the time having a substantial equity in the stocks and having no knowledge that the defendants intended to close out their business, was not bound to inquire where his stocks were or what was being done with them.

The plaintiff after being advised between the middle and the latter part of April that the defendants had gone out of business, one month constituted a reasonable time within which to determine if he should replace the stocks, so as to fix the limit of prices to be used as a basis for determining damages.

JOHN M. KELLOGG, P. J., dissented.

Appeal by the plaintiff, John A. O'Connor, from a judgment of the Supreme Court in his favor, entered in the office of the clerk of the county of Albany on the 2d day of February, 1918, upon the report of a referee adjudging that he be limited in his judgment against the defendants to the sum of $4,373, with interest.

Appeal by the defendants, G. Edward Graff and another, from the whole of said judgment.

*H. Walter Lee* [*Andrew J. Nellis* of counsel], for the plaintiff.

*Davis, Doyle & Davis* [*John B. Doyle* and *Edward Murphy* of counsel], for the defendants.

Woodward, J.:

The plaintiff brought this action to recover the value of stocks purchased on margin by him from the defendants, who were stockbrokers, and by whom the stocks were held as collateral for sums advanced by them for the plaintiff's account upon the several purchases. The action is for conversion because of the sale of these stocks by the defendants without notice to the plaintiff. It is not a case where the defendants required further margins; at the time of the alleged conversion the plaintiff owned a substantial equity in the stocks.

The case was tried before a referee who directed that judgment be entered for the plaintiff for the sum of $4,372.68, which was the amount of the equity realized upon the sale by the defendants, plus interest from that day to the time of the signing of the referee's findings.

Both parties have appealed, the defendants urging that as to the defendant Gilmore the complaint should have been dismissed, because he was a special partner, and as to both defendants the plaintiff should not succeed for the reason that he was estopped to urge the claim. On his appeal the plaintiff contends that he was entitled to a judgment larger by many thousands of dollars than that directed by the referee.

The orderly examination of the propositions offered for our consideration by these appeals suggests that the question of the liability of the special partner Gilmore be first discussed.

Third Department, January, 1919.          [Vol. 186.

The defendants maintained their principal office as stock-brokers in the county of New York and in that county filed certificates of limited partnership, as required by section 30 of the Partnership Law (Consol. Laws chap. 39; Laws of 1909, chap. 44), with proof of their publication, and there now arises no question as to their sufficiency to establish a partnership, limited in character, so far as its transactions in that county might be affected. The defendants, however, maintained a branch office in the city of Albany conducted by one McClure, whom they constituted their manager at that point, but in the office of the county clerk of Albany county there was filed no copy of any certificate of limited partnership as required by section 30 of the Partnership Law. After pointing the way by which a limited partnership might be formed, that section provides: " If the partnership has places of business situated in different counties, a copy of the certificate, and of the acknowledgment thereof, certified by the clerk in whose office it is filed, under his official seal, shall be filed and recorded in like manner, in the office of the clerk of each such county."

The defendant Gilmore contends that the failure to file and record in the county of Albany does not render him liable as a general partner as to the transactions with the plaintiff. All the plaintiff's business transacted with the partnership was had with and through the office located in Albany. No logical reason is suggested nor can be conceived why the Legislature should have inserted the provision in respect to filing and recording in counties other than the county of the principal place of business unless it was intended to affect the status of the parties as to transactions occurring. in such other counties. Section 3 of the Partnership Law provides that " a partnership formed otherwise than in the manner prescribed in this chapter for the formation of a limited partnership, is a general partnership." Then, too, while limited partnerships have been recognized in some of the European countries since the twelfth and thirteenth centuries, they were unknown to the common law, and it follows, under familiar principles, that one who seeks to escape the liability of a general partnership must at his peril comply strictly with the provisions of the statute. While this does not mean that

the compliance must in all cases be literal, as was held in *President, etc., of Manhattan Co.* v. *Laimbeer* (108 N. Y. 578); *Buck* v. *Alley* (145 id. 488) and *Fifth Avenue Bank* v. *Colgate* (120 id. 381), it does mean that there must be a substantial, *bona fide* effort to comply with the substance of the mandatory requirements at least. Here no copy of the original certificate was either filed or recorded, nor attempted to be filed or recorded, so far as it appears, in Albany county. Without such filing and recording the defendant has failed to do those things which, under the statute, permit him to escape a liability which would attach at common law. The courts have required substantial compliance of a special partner who seeks to escape liability. A contribution otherwise than in cash has been held to be an insufficient compliance with the statute (*Haviland* v. *Chace*, 39 Barb. 283; *Van Ingen* v. *Whitman*, 62 N. Y. 513); and the contribution by a special partner of a post-dated check was held not to be a compliance with the requirement for cash contributions (*Durant* v. *Abendroth*, 69 N. Y. 148); and that a renewal certificate of the limited partnership filed after the expiration of its existence as fixed in the original certificate instead of before or at the time of such expiration has been held not to be a substantial compliance with the requirements of the statute as to renewal of the special partnership. (*Columbia Bank* v. *Berolzheimer*, 33 App. Div. 235. See, too, *Loomis* v. *Hoyt*, 52 N. Y. Super. Ct. 287.) We conclude that the learned referee was correct in his ruling denying the motion of the defendant Gilmore to dismiss the complaint as to him.

The defendants' contention that the plaintiff is estopped to make this claim against his brokers is not valid. The claim is based upon the argument that the defendants turned over their business to the New England Securities Company to whom the plaintiff should look, and upon the further argument that the defendants carried the plaintiff's account under a fictitious name. It is necessary to state some of the facts surrounding the transactions between the parties in order to determine whether any rule of law has been violated in this branch of the case by awarding a judgment to the plaintiff.

McClure was the defendants' manager in Albany. Mallett was an employee in that office, who had been himself in the

brokerage business for many years and took an active part in the defendants' Albany office during the two or three years from its opening until the closing of the Stock Exchange on July 31, 1914. The plaintiff transacted all his business, not with McClure, but with Mallett. In July, 1914, the defendants were carrying an account with the plaintiff and had been for about a year and a half. On the day before the Stock Exchange closed the plaintiff purchased at the defendants' office 100 shares of United States Steel and United States Rubber. From the time the exchange closed until April, 1915, the plaintiff did not visit the defendants' office. When the Stock Exchange opened, on December 12, 1914, prices of stocks generally commenced to rise and increased for several months. About September 1, 1914, the defendants having determined to wind up their business, closed the accounts of the Albany office on the basis of stock prices on the market on July 31, 1914, and at some time between that date and December of that year arranged with the New England Securities Company to take over their Albany business, and forwarded to Mallett, who it was arranged was to act as correspondent for the New England Securities Company, a check representing the equity in certain stocks carried in the Albany office, among which were plaintiff's stocks, which he was to turn over to the securities company.

We have searched the record diligently and failed to discover any evidence of the fact that the plaintiff was ever advised or knew or had reason to suppose that the securities company or any concern other than the defendants' had been intrusted with carrying his stock. It is true that he and Mallett had been business acquaintances for some years and during that period the plaintiff had consummated stock transactions through Mallett. It may also be possibly inferred from the evidence that between September 1, 1914, and April, 1915, he and Mallett might have lunched together on one or more occasions, and it seems that two or three times during this period the plaintiff called up Mallett to inquire about prices of stock generally. But aside from this there is no suggestion that the plaintiff ever knew or heard of the securities company. While it is true, as the defendants urge, that triers of the facts are the judges of the credibility of witnesses, that principle by

no means goes to the extent of declaring that a finding of fact may be established without the slightest evidence to support it. Unless we are authorized to find as a matter of fact that on one or more of these occasions Mallett advised the plaintiff of the advent of the securities company, the state of the record is such, in view of the positive denial of both the plaintiff and Mallett, that the plaintiff is not shown to have known of the securities company. Without that knowledge the doctrine of estoppel is introduced into the case with nothing to support its application.

The same may be said in relation to the carrying of plaintiff's transactions on the books of the defendants' business in an account under a fictitious name. It is true that the plaintiff's stocks and a considerable number of stocks of other customers were so carried both at the Albany office and the principal office in New York under the name of D. H. Andrews, but there is nothing to suggest that plaintiff ever requested this to be done or ever knew that it was being done. We do not mean to say that if he had known of it the defendants would be entitled to succeed; what we do hold is that here again no facts were established upon which the argument of estoppel may be founded.

This brings us to a consideration of the sole point upon which the plaintiff bases the appeal he had lodged against the judgment. He insists that the judgment should be much larger than that directed by the referee. The computation to determine the amount of the judgment depends on the date when the plaintiff knew or should have known of the conversion of his stock. The referee has held that plaintiff was under the circumstances bound to ascertain the condition of his affairs and learn of the sale soon enough after September 1, 1914, the date of the actual conversion, so that before December 1, 1914, he would have had a reasonable time to determine whether he wished to replace them. The Stock Exchange being closed between July thirty-first and December twelfth, and no change in prices occurring, the referee has measured the amount of the plaintiff's damage by taking the prevailing prices on July 31, 1914, as their value at the time they were converted, which in the aggregate was $23,843.75. From this sum he has subtracted the amount of plaintiff's indebtedness including

interest, $20,184.56, and directed a judgment for the balance, $3,659.19, with interest.

It is conceded that the conversion took place on or about September 1, 1914, but the plaintiff denies that he knew of it until a year afterward, and seriously contends that the circumstances were such that he was not charged either with knowledge or the duty of making an investigation which might have revealed that knowledge.    On the other hand, it appears that the plaintiff and Mallett had been business acquaintances for a number of years; that they had been to lunch together; that the plaintiff had grown familiar with the stock market and had dealt in stocks for twenty years, keeping in constant touch with the market when he was in town and having a ticker in his office.    But Mallett testifies that he does not think he ever saw the plaintiff during the four months and a half that the market was closed; that he never communicated to the plaintiff between the middle and the latter part of April, 1915, any information that the defendants intended to go out of business; that his stock had been sold, or that the securities company were interested in any way in this field; and the plaintiff himself testifies to the same facts.    What was there, then, to suggest to the plaintiff that it was his duty to make inquiry to find out the condition of the stocks?    He had carried 500 of Copper from December, 1914, and 200 of American Can and United States Rubber from the spring of 1914, during the decline of prices.    He had, therefore, owned 500 shares of one stock a year and a half and 200 shares of other stock for several months without disposing of them or changing his trades in them.    Without doubt he knew, and it is so argued by the defendants, that the Stock Exchange closed on July thirty-first, and he himself says that, because he knew the Stock Exchange was closed, he realized that nothing would be done with his stocks until the exchange reopened.    These circumstances, it seems to us, fall far short of presenting conditions which imposed upon the plaintiff a duty to inquire where his stocks were or what was being done with them. The learned referee has placed his decision, in this branch of the case, upon *Mayer* v. *Monzo* (221 N. Y. 442).    In that case it was held that circumstances might charge the owner of stocks with this duty; and these were such circumstances

held in that case to present a question of fact for the jury to say if such duty existed; that the owner of the stocks was of mature years and wide business experience and had accumulated much property; that he had traded with his brokers about a year, carrying 10,000 shares on margin; that about two months before the conversion of the stocks he knew that their value had so depreciated that he already owed the brokers a large balance above their value and was being urged to put up additional margins which he failed to do; that he knew of their suspension and that a receiver had taken possession of their office; that there was a widespread panic in the stock market causing rapid decline in stock values, and that his stocks were subject to sale for payment of the indebtedness due on the purchase price; but, notwithstanding these facts, he made no inquiries concerning the location or disposition of his stocks. The Court of Appeals held that such facts would permit a jury to find that the defendant was possessed of or charged with such knowledge and notice of the sale of his stocks about the time they were sold as would set running the period within which he would be compelled to determine what course he would pursue and which would fix the limit of prices which could be used as a basis for a claim of damages against the brokers for the conversion. The court did not hold, however, that under such circumstances he was possessed or chargeable with notice of the sale as matter of law; the question is left as one of fact. Here, however, the circumstances are widely different. In the *Mayer* case the owner of the stocks was indebted to his brokers in a large sum and had been called upon for additional margins; here the plaintiff had an equity of between $3,000 and $4,000 in the stocks on the thirty-first of July, and while the Stock Exchange remained closed this equity did not diminish, and the plaintiff was not called for more margin. In the *Mayer* case the owner knew of the brokers' suspension and failure and that a receiver had taken possession; here the defendants did not fail; nothing like a receivership occurred; plaintiff denies that he ever knew of their intending to close out their Albany business, and no proof is adduced to show knowledge of this in him. In the *Mayer* case the panic was causing constant decline in values; in this case the Stock Exchange was

closed; there could be no trading, and, hence, no fluctuation in values.

Upon this branch of the case the facts that the Stock Exchange was closed for several months and that the plaintiff at the time of the closing had a substantial equity in the stocks are of persuading force in the determination of the question of fact whether the plaintiff was chargeable with the duty to inquire in respect to the condition of his stock. There is no proof in the record that the closing of the Stock Exchange was accompanied by business failures, or by any other condition which would suggest to one accustomed to trading in stocks that his holdings were in a precarious condition. It stands out strongly that the plaintiff was entirely justified during the period of closure in supposing that his stocks were intact. We are, therefore, compelled to hold that the referee's findings of fact in this connection are not supported by the evidence, and to make a contrary finding in this court.

What has been said deals with the situation up to the reopening of the Stock Exchange on December 12, 1914. For the purpose of fixing a date to start running that reasonable period within which the plaintiff would be compelled to determine what course he would pursue and which would fix the limit of prices to be used as a basis for determining damages, it becomes necessary to examine the conditions subsequent to the reopening of the exchange. At that time the prices of stocks generally started to increase and kept on increasing, and the plaintiff says, what it is entirely reasonable to suppose is the truth, that he knew of these increases and appreciated that his stocks were becoming more valuable the longer he allowed them to remain with the defendants, where he supposed them to be. During this period of enhancement of value there was, therefore, certainly no condition or circumstance to suggest a duty on the part of the plaintiff to inquire what was being done with them. The value of stocks was still increasing in the month of April and between the middle and the latter part of that month the plaintiff was advised by Mallett that the defendants had gone out of business. On the same day the plaintiff arranged to pay his indebtedness to the defendants and directed Mallett to have his stocks delivered to his bank. They were, of course, never

delivered, for they had been converted by the defendants several months before, and the plaintiff holds that he should be allowed a reasonable time within which to determine if he should replace them, after he actually learned that they had been converted, which was not until the fall of 1915. His contention, however, is not sound. The advice to him in the latter part of April, 1915, that the defendants had gone out of business was enough to put him upon inquiry. The defendants' business had been to purchase and carry stocks for customers on margin. The plaintiff should not be allowed to sit idly by, after being advised that they had ceased transacting the very kind of business that plaintiff was doing with them. That he appreciated the necessity of a positive move on his part is shown by his immediate request, on learning of the cessation of their business, that the stocks be delivered to his bank. He could have ascertained immediately that the stocks had been sold, if he had instituted an inquiry, and the time within which he would be compelled to determine what course he would pursue must be held to commence upon the expiration of the " latter part of April." The duration of this period is always governed by circumstances, longer in some cases than in others. Here it is believed that one month was a reasonable time within which the plaintiff should make his determination.

Conforming to the views expressed, the 14th and 15th findings of fact must be overruled; the highest prices that these stocks attained between the 1st and 31st of May, 1915, inclusive, should measure the extent of the plaintiff's damage. The items of interest chargeable to the plaintiff, and of dividends chargeable to the defendants, and the values of the stocks during the immediate period are not in dispute, and will form the basis of new findings, which will be settled, on notice, to support the enchanced judgment we direct.

The judgment so far as it denies the plaintiff's larger recovery is, therefore, reversed, and the balance of the judgment modified as here expressed, and so as modified affirmed, with costs to the plaintiff.

All concurred, except JOHN M. KELLOGG, P. J., who voted for reversal.

Judgment, so far as it denies the plaintiff's larger recovery, reversed on law and facts, and the remainder of the judgment modified as expressed in the opinion, and as so modified affirmed, with costs to the plaintiff. The court disapproves of the finding that the plaintiff's damages were only $4,373, and finds that they were more, as per opinion.