LeAnna BROADWATER, Plaintiff, Appellee and Cross–Appellant,

v.

OLD REPUBLIC SURETY, a Wisconsin corporation doing business in Utah, Northwestern National Insurance Company of Milwaukee, Wisconsin, a Wisconsin corporation doing business in Utah, Atlas Stock Transfer, a Utah corporation, Check Rite International, Inc. f/k/a Cardinal Energy Corporation, a Utah corporation, and Scott J. Fletcher, a Utah resident, Defendants, Appellants and Cross–Appellees.

No. 920300.

Supreme Court of Utah.

June 4, 1993.

John Michael Coombs, Salt Lake City, for LeAnna Broadwater.

Robert A. Burton, Stephen J. Trayner, H. Burt Ringwood, Salt Lake City, for Old Republic Sur., Northwestern Nat. Ins.

Larry G. Reed, Salt Lake City, for Atlas Stock.

Philip R. Hughes, Salt Lake City, for Check Rite.

STEWART, Justice:

Plaintiff LeAnna Broadwater filed this action against Atlas Stock Transfer (Atlas) and Check Rite International (Check Rite) for wrongful refusal to transfer stock, conversion, and breach of an implied covenant of good faith and fair dealing. For the purpose of summary judgment, defendants

conceded liability on the wrongful refusal to transfer stock and conversion claims, and the parties submitted the issue of damages to the district court. On that basis, the district court granted summary judgment in favor of plaintiff on the merits of these claims. The court then ruled that plaintiff's damages for the conversion of her stock should be measured at the time when Check Rite stock peaked in price, approximately ninety days after plaintiff received notice of the conversion. The court also denied a motion by defendants to strike affidavits submitted in support of plaintiff's motion and granted plaintiff's request for attorney fees. Check Rite and Atlas appeal from these rulings.

Plaintiff also filed suit against Northwestern National Insurance Company (Northwestern) and Old Republic Surety (Old Republic) for breach of an implied covenant of good faith and fair dealing, breach of an implied third-party beneficiary contract, and bad faith refusal to settle a claim. She cross-appeals from the district court's dismissal of these claims.

We view the facts and inferences to be drawn therefrom in a light most favorable to the party opposing a motion for summary judgment. *Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989); *Arrow Indus. v. Zions First Nat'l Bank*, 767 P.2d 935, 937 (Utah 1988). The record contains the following undisputed facts.

In 1981, plaintiff purchased 8,000 shares of stock in Cardinal Energy Corporation, now known as Check Rite, from Potter Investment Company. Potter Investment, which had purchased the stock from Scott Fletcher, delivered to plaintiff certificate 258, still registered to Fletcher. Approximately one year after selling the stock, Fletcher reported to Atlas, Check Rite's transfer agent, that certificate 258 was lost or stolen. Atlas informed Fletcher that he must obtain a lost instruments bond before Atlas would place a stop transfer on the certificate and issue a new one. Fletcher purchased a bond from Northwestern, which designated Northwestern as obligor and Atlas and Check Rite as obligees. Atlas subsequently placed a stop transfer on certificate 258 and issued a replacement certificate to Fletcher.

In 1988, plaintiff presented certificate 258 to Atlas and requested that the stock be transferred to her name. In a letter dated May 4, 1988, Atlas informed plaintiff that it would not transfer the stock because of the stop transfer. Atlas further advised plaintiff that it was retaining and canceling the certificate.

When plaintiff called Atlas for an explanation, she was told that the previous owner had reported the certificate lost and had posted a lost instruments bond with Northwestern. Atlas then told plaintiff that "for purposes of convenience and efficiency, she should communicate directly with Northwestern" to resolve the problem.

Plaintiff contacted Northwestern's Salt Lake branch and explained the problem to an employee, who promised to investigate the matter and report back to her. After hearing nothing for two weeks, plaintiff again called Northwestern. She repeated her story and stated that Atlas told her that Northwestern would take care of the problem. Plaintiff was again assured that the matter would be looked into and that she would be contacted. When another week passed with no word from Northwestern, plaintiff called and demanded to know with whom she had to speak to resolve the problem. Plaintiff was referred to Northwestern's home office in Wisconsin, but was not given the name of a specific person with whom she should speak.

In late June 1988, plaintiff contacted Paul Guardalabene, assistant claims attorney for Old Republic Surety. Old Republic was Northwestern's successor in interest and, therefore, the new obligor on the lost instruments bond.[1] Guardalabene asked

**1.** It is undisputed that Guardalabene initially received notice of plaintiff's potential claim from Northwestern's Salt Lake branch on May 20, 1988. Guardalabene contacted Fletcher four days later and asked him to contact the necessary parties to determine what had happened and what could be done to settle the claim. On June 13, 1988, Guardalabene wrote to Fletcher's

plaintiff to send documentation confirming her ownership of the stock and told her that he would be investigating the matter and would appreciate any assistance she could provide. He also offered to settle the matter for the original purchase price of the stock.

Plaintiff followed up this telephone conversation with a letter dated July 11, 1988, which stated that she had purchased the stock from Potter Investment on September 1, 1981, for $.31 per share. The letter also stated that plaintiff would not accept Guardalabene's proposed settlement and requested that Old Republic purchase replacement stock so that plaintiff could sell her shares at a time of her choosing. The letter remarked that the market appeared to be firming up and that plaintiff would like the matter resolved as quickly as possible.

On July 20, 1988, Guardalabene wrote to Mr. Fletcher's counsel requesting that Fletcher respond to plaintiff's July 11, 1988 letter. On July 27, 1988, plaintiff called Guardalabene to confirm that her documentation of ownership was all that he needed. With her documentation of ownership, she sent a letter stating that Check Rite stock was then trading at $1.00 per share and could continue to go higher.

Guardalabene received plaintiff's letter and documentation of ownership on August 1, 1988. In a letter dated August 10, 1988, Guardalabene, for the first time, informed plaintiff that Old Republic could not settle directly with her because she was not an obligee on the bond. The letter explained that although Old Republic wished to mitigate losses, it had not been presented with proper documentation from the obligee.

Guardalabene then wrote Atlas, stating that in 1985, Northwestern had paid on a bond for another certificate issued to Fletcher. Guardalabene questioned whether Cardinal Energy had erred in issuing one certificate too many to Fletcher. The letter also suggested that Atlas take the necessary steps to mitigate any potential loss that Atlas or Check Rite might sustain due to fluctuations in the price of the stock. Plaintiff's documentation of ownership was enclosed for comment.[2]

Check Rite stock fluctuated widely between May and August 10, 1988. Plaintiff submitted affidavits that Check Rite stock sold for as much as $1⅚16 per share on July 28, 1988, and for $1⅜ and $1.25 during the last week in July. Soon after, the price of the stock dropped below $1.00.

Plaintiff filed suit against Atlas and Check Rite for wrongful refusal to transfer her stock, conversion, and breach of an implied covenant of good faith and fair dealing. Plaintiff also filed suit against Old Republic and Northwestern for breach of an implied covenant of good faith and fair dealing, breach of an implied third-party beneficiary contract, and bad faith refusal to settle a claim.

Following brief discovery, the parties filed cross-motions for summary judgment on the claims of wrongful refusal to transfer the stock and conversion. Because Atlas and Check Rite conceded liability, the issue on summary judgment was the amount of damages to be awarded. The district court applied the New York rule, which sets the measure of damages as the highest market price of the stock between the date of the conversion and a reasonable time following notice of the conversion. The court held that under the particular

---

attorney to seek his assistance in investigating the claim.

**2.** We note here that the parties dispute the occurrence and content of two telephone conversations. Plaintiff alleges that sometime prior to September 21, 1988, Guardalabene told her that he was still investigating her claim, but that Fletcher's signature on certificate 258 might be a forgery. He also told plaintiff that she should have been dealing directly with Atlas and Check Rite all along. Plaintiff also claims that at one point Guardalabene told her to deal directly

with Fletcher and that when she protested that this was not her responsibility, Guardalabene told her to get a lawyer. Plaintiff does not remember the dates of these alleged conversations.

Guardalabene recalls only two telephone conversations with plaintiff, the initial one in June 1988 and the one on July 27, 1988.

Whether these telephone conversations took place as reported by plaintiff, however, is not material to the disposition of this matter.

circumstances of the case and in view of "the chronology of the efforts plaintiff pursued to seek satisfaction without resort[ing] to legal action," ninety days was a reasonable period of time. The court then ruled that the measure of damages should be computed at $1⅚₆ per share, the highest price reached during the ninety-day period. The trial court denied a motion by defendants to strike various affidavits submitted by plaintiff in support of her motion for summary judgment and granted plaintiff's prayer for attorney fees. Atlas and Check Rite appeal from these rulings.

Plaintiff cross-appeals from the district court's order dismissing her claims against Old Republic and Northwestern for breach of an implied covenant of good faith and fair dealing, breach of an implied third-party beneficiary contract, and bad faith refusal to settle a claim.

## I. MEASURE OF DAMAGES

 As a general rule, the measure of damages for the conversion of property is the value of the property at the time of the conversion, plus interest. *Murdock v. Blake*, 26 Utah 2d 22, 30, 484 P.2d 164, 169 (1971); *Lowe v. Rosenlof*, 12 Utah 2d 190, 195, 364 P.2d 418, 421 (1961); *Western Sec. Co. v. Silver King Consolidated Mining Co.*, 57 Utah 88, 109, 192 P. 664, 672 (1920); *Nephi Processing Plant v. Talbott*, 247 F.2d 771, 774 (10th Cir.1957). That remedy is inadequate, however, when the property converted, such as stock, fluctuates in value. *Galigher v. Jones*, 129 U.S. 193, 200, 9 S.Ct. 335, 337, 32 L.Ed. 658 (1889); *Schultz v. Commodity Futures Trading Comm'n*, 716 F.2d 136, 140 (2d Cir.1983); *In re Salmon Weed & Co.*, 53 F.2d 335, 341 (2d Cir.1931). The injury to the owner of converted stocks is not merely in the loss of control over the stock, "but in the sale of it at an unfavorable time, and for an unfavorable price." *Galigher*, 129 U.S. at 200, 9 S.Ct. at 337.

Recognizing the unfairness of the general rule as applied to the conversion of stock and other property with fluctuating values, the courts at common law held that the proper measure of damages should be the highest value of the property between the date of conversion and the date of trial. *Galigher*, 129 U.S. at 200–01, 9 S.Ct. at 337–38; *see, e.g., Bennett v. Tucker & Pennington*, 32 Ga.App. 288, 123 S.E. 165, 166 (1924); *Bank of Montgomery v. Reese*, 26 Pa. 143, 145 (1856). That measure proved unsatisfactory because it allowed a plaintiff to ride the stock market at the defendant's risk and expense until trial, which might not take place until years after the conversion. *Galigher*, 129 U.S. at 201, 9 S.Ct. at 337; *Schultz*, 716 F.2d at 140.

In the late nineteenth century, the New York Court of Appeals adopted what has become known as the New York rule, which sets the measure of damages as the highest intermediate value of the stock between the time of conversion and a reasonable time after the owner receives notice of the conversion. *Baker v. Drake*, 53 N.Y. 211 (1873); *Wright v. Bank of the Metropolis*, 110 N.Y. 237, 18 N.E. 79 (1888). The New York rule indemnifies the owner of the converted stock for his or her loss, while requiring the owner to mitigate damages by replacing the stock within a reasonable time after notice of the conversion. *See Hayward v. Edwards*, 167 Misc. 694, 4 N.Y.S.2d 699, 701 (Sup.Ct.1938). The rule affords the owner of the stock a reasonable opportunity to consult counsel, employ other brokers, watch the market to determine when it would be advisable to purchase replacement stock, and raise funds should the owner decide to repurchase. *Caballero v. Anselmo*, 759 F.Supp. 144, 149 (S.D.N.Y. 1991); *Hornblower & Weeks–Hemphill Noyes v. Lazere*, 301 Minn. 462, 222 N.W.2d 799, 806 (1974); *Rosenbaum v. Stiebel*, 137 A.D. 912, 122 N.Y.S. 131, 134 (1910); *Morison v. Dominion Nat'l Bank of Bristol*, 172 Va. 293, 1 S.E.2d 292 (1939).

In an appeal from the territorial court of Utah, the United States Supreme Court adopted the New York rule as the appropriate measure of damages for the conversion of stock. *Galigher*, 129 U.S. at 201–02, 9 S.Ct. at 337–38. This Court later did the same, observing that the New York rule provided the fairest measure of damages when stock has been converted. *Western*,

57 Utah at 109, 192 P. at 672. In *Western,* this Court held that if the plaintiff did not act within a reasonable time after notice of the conversion to mitigate his damages by repurchasing the stock, he would be limited to a reasonable time for calculating his damages. *Id.* at 109, 192 P. at 672.

■ Atlas and Check Rite argue that although the district court was correct in applying the New York rule, it erroneously concluded that ninety days was a reasonable length of time. They contend that the trial court should have ruled that as a matter of law a reasonable time was no more than thirty days. Plaintiff proposes that we now abandon the New York rule in favor of a different measure of damages. Alternatively, she argues that the trial court was correct in concluding that ninety days was a reasonable period of time under the circumstances of this case.

Plaintiff advances no policy or other reason for departing from the New York rule, other than that it would be to her advantage to do so. In our view, the New York rule continues to provide the fairest measure of damages to all involved. The rule indemnifies a plaintiff for the conversion of stock without affording a windfall at the expense of the defendant, who, more often than not, committed the conversion due to honest mistake or inadvertence. *See Galigher,* 129 U.S. at 201, 9 S.Ct. at 337; *Foley v. Wasserman,* 319 Pa. 420, 179 A. 595, 598 (1935).

The issue before us, therefore, is whether the trial court correctly ruled that plaintiff was reasonable in delaying ninety days to mitigate her damages. When, as here, the relevant facts are uncontroverted, that question is one of law. *Pacific Dev. Co. v. Stewart,* 113 Utah 403, 409, 195 P.2d 748, 751 (1948); *see also Hayward,* 4 N.Y.S.2d at 701; *Rosenbaum,* 122 N.Y.S. at 134; *Wright,* 18 N.E. at 84.

What constitutes a reasonable time varies with the particular facts and circumstances of each case. *Reynolds v. Texas Gulf Sulphur Co.,* 309 F.Supp. 548, 565 (D.Utah 1970), *rev'd in part on other grounds sub nom. Mitchell v. Texas Gulf Sulfur Co.,* 446 F.2d 90 (10th Cir.1971);

*Caballero,* 759 F.Supp. at 149; *Hornblower,* 222 N.W.2d at 806–07; *O'Connor v. Graff,* 173 N.Y.S. 730, 737 (App.Div.1919), *aff'd,* 230 N.Y. 552, 130 N.E. 890 (1920). Depending upon the individual circumstances, courts have held that anywhere from a few days to several months, or even years, may be reasonable. *Mayer v. Monzo,* 221 N.Y. 442, 446–47, 117 N.E. 948 (1917); *see, e.g., Smith v. Savin,* 141 N.Y. 315, 36 N.E. 338, 342 (1894) (approximately four weeks); *Mullen v. J.J. Quinlan & Co,* 195 N.Y. 109, 87 N.E. 1078, 1080 (1909) (two months); *Wright,* 18 N.E. at 84 (two months); *Morison,* 1 S.E.2d at 295 (29 months); *Hayward,* 4 N.Y.S.2d at 703 (six months, based on minority of owner); *Caballero,* 759 F.Supp. at 152 (10 years, due to owner's minority).

We believe that under the circumstances of this case, it was not error for the trial court to conclude that plaintiff was reasonable in delaying the mitigation of her damages for more than ninety days. The parties agree that plaintiff received notice of the conversion of her stock on May 4, 1988. Plaintiff was then told by Atlas that Northwestern had issued a lost instruments bond and that she should contact Northwestern directly to file a claim. Due to Northwestern's nonresponsiveness, plaintiff was unable to contact Old Republic, the new obligor on the bond, for over thirty days.

When plaintiff contacted Old Republic, Guardalabene told plaintiff that he would investigate the matter. He asked plaintiff to send documentation of ownership and offered to pay her the purchase price of the stock. It was not until August 10, 1988, more than ninety days after notice of the conversion, that Guardalabene informed plaintiff that Old Republic would not deal directly or settle with her and that she should have been working with Atlas and Check Rite. These facts support the trial court's conclusion that it was reasonable for plaintiff to delay until after Old Republic informed her that it would no longer deal with her.

■ Defendants contend that Guardalabene did not intentionally lull plaintiff into inaction and, therefore, it was not reasonable for plaintiff to delay mitigating her

damages. Whether Guardalabene intentionally misled plaintiff is irrelevant to what constitutes a reasonable time. The proper inquiry is how long a reasonable person would delay in mitigating her damages in view of all the circumstances. Had Atlas not told plaintiff of the existence of the bond and that she had to resolve the problem directly with Northwestern, plaintiff would have been on notice that her only recourse would be to replace the stock and recoup her loss through litigation. Old Republic's request for documentation, investigation of the matter, and offer of settlement only perpetuated plaintiff's assumption that the bond would cover her loss.

Defendants also assert that the trial court relied on disputed facts in determining that ninety days was a reasonable time. This contention is without merit. The facts cited above in support of the reasonableness of the ninety-day period are neither disputed nor controverted in the record.

We therefore affirm the award of damages to plaintiff for the conversion of her stock.

## II. MOTION TO STRIKE AFFIDAVITS

Defendants challenge the denial of their motion to strike five affidavits plaintiff submitted in support of her motion for summary judgment on the ground that the affidavits did not comport with the requirements of Rule 56(e) of the Utah Rules of Civil Procedure. Rule 56(e) provides, "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Defendants assail two of the affidavits submitted by plaintiff because they contain opinion, legal conclusions, and facts not supported by adequate foundation. Although a review of the affidavits confirms this assessment, portions of the affidavits do comply with Rule 56(e). The objectionable statements consist of legal arguments and conclusions and did nothing more than supplement the arguments made in plaintiff's memorandum. We fail to see how this prejudiced defendants.

Defendants next challenge the affidavits of Chuck Burton and Penny Grace on the grounds that they lack sufficient foundation for the facts stated and because the Burton affidavit contains hearsay. Plaintiff apparently submitted these affidavits to establish the highest price Check Rite stock reached after the conversion of her stock. Burton's affidavit stated that he was an account executive with a securities broker in Denver, Colorado and that he recalled a transaction in which Check Rite stock sold at $1\frac{3}{8}$ per share at the end of July or early August 1988. Penny Grace stated in her affidavit that she has purchased Check Rite stock for clients since September 17, 1987, and that on July 28, 1988, she personally bought 20,000 shares of Check Rite stock for various clients at $1\frac{5}{16}$ per share. These statements were clearly made on the basis of personal knowledge and set forth facts that would be admissible in evidence. The affidavits therefore complied with Rule 56(e).

The alleged hearsay statement in the Burton affidavit stated that plaintiff called Burton and inquired as to the current price of Check Rite stock. Plaintiff apparently offered this statement to prove that she was closely following the price of Check Rite stock. Even assuming that the statement is inadmissible hearsay, defendants were not harmed by its admission because the parties do not dispute that plaintiff closely followed the price of the stock.

Defendants finally attack the affidavit of George Potter, president of Potter Investment, on the ground that it contains hearsay and lacks adequate foundation for many of the facts stated therein. Defendants appear to object to Mr. Potter's statement that stock certificate 258 had been properly endorsed by Scott Fletcher and that plaintiff had tendered valuable consideration for the stock. Those facts, however, go to the issue of liability, which was conceded by defendants. The Potter affidavit also stated that sometime near the end of June or early July, Mr. Potter told Guardalabene in a telephone conversation that penny stocks such as Check Rite were

volatile and that Old Republic should settle quickly with plaintiff to avoid unnecessary damages. This statement is not relevant to the issue of damages and did not harm defendants' position.

We affirm the trial court's denial of defendants' motion.

### III. ATTORNEY FEES

■ Defendants assert that there is no legal basis to support the trial court's award of attorney fees to plaintiff. As a general rule, a prevailing party to a lawsuit is not entitled to attorney fees unless there is a contractual or statutory basis for the award. Some courts have recognized an exception to the general rule by allowing a plaintiff to recover attorney fees incurred in *regaining possession* of converted property. *See* 18 Am.Jur.2d *Conversion* § 120 (1985); *Gladstone v. Hillel*, 203 Cal.App.3d 977, 250 Cal.Rptr. 372, 380–81 (1988); *Motors Ins. Corp. v. Singleton*, 677 S.W.2d 309, 315 (Ky.Ct.App.1984). This exception, however, has not been extended to damage claims for conversion. *Watkiss & Campbell v. FOA & Son*, 808 P.2d 1061, 1067 (Utah 1991); *Canyon Country Store v. Bracey*, 781 P.2d 414, 419–20 (Utah 1989); *Turtle Management, Inc. v. Haggis Management*, 645 P.2d 667, 671 (Utah 1982); *see also Haines v. Parra*, 193 Cal.App.3d 1553, 239 Cal.Rptr. 178, 181 (1987); *Singleton*, 677 S.W.2d at 315; *Pierson v. GFH Fin. Serv.*, 829 S.W.2d 311, 316 (Tex.Ct. App.1992); *George Thomas Homes v. Southwest Tension Sys.*, 763 S.W.2d 797, 800 (Tex.Ct.App.1988).

■ In her complaint, plaintiff requested attorney fees under Utah Code Ann. § 78–27–56 on the ground that defendants asserted their defense in bad faith. For a prevailing party in a civil action to be awarded attorney fees under § 78–27–56, a court must find that (1) the action, or in this case the defense, is without merit and (2) the defense was asserted in bad faith. *Watkiss & Campbell*, 808 P.2d at 1068; *Cady v. Johnson*, 671 P.2d 149, 151 (Utah

1983); *Amica Mut. Ins. Co. v. Schettler*, 768 P.2d 950, 966 (Utah Ct.App.1989). Unfortunately the district court simply awarded attorney fees to plaintiff without making the appropriate findings under the statute. In the absence of specific findings as to the elements of § 78–27–56, we cannot determine the basis for the award. *Watkiss & Campbell*, 808 P.2d at 1068.

■ We do not remand, however, because even assuming that defendants asserted their defense in bad faith, nothing in the record supports a conclusion that the defense was without merit.[3] A defense lacks merit when it is "frivolous" or "of little weight or importance, having no basis in law or fact." *Cady*, 671 P.2d at 151. The point at which plaintiff should have mitigated her damages is a legitimate issue that can hardly be characterized as frivolous or as having no basis in law or fact. Section 78–27–56, therefore, does not provide a basis for the award of attorney fees.

■ Plaintiff contends on appeal that the trial court properly awarded attorney fees as part of her damages for conversion. She argues that *Nephi Processing Plant, Inc. v. Talbott*, 247 F.2d 771 (10th Cir. 1957), and *South Sanpitch Co. v. Pack*, 765 P.2d 1279 (Utah Ct.App.1988), support the award on that basis. *Nephi Processing* did not specifically address the issue of attorney fees, but held that the owner of converted property is entitled to lost profits. Plaintiff argues that her attorney fees should be included as part of her lost profits. We disagree. Plaintiff's lost profits are those she would have realized had she retained control of her stock. The attorney fees are expenses incurred in *recovering* her lost profits—they are not profits that plaintiff would have had if the conversion had not occurred.

Plaintiff's reliance on *South Sanpitch* is also misplaced. In that case, a title company negligently failed to timely record the plaintiff's deed. As a result, the plaintiff was forced to file a quiet title action

---

**3.** Whether a defense is without merit is a question of law, which can be determined on appeal. *Jeschke v. Willis*, 811 P.2d 202, 203 (Utah Ct.App.

1991). The issue of bad faith, on the other hand, is a question of fact to be ascertained by the finder of fact. *Id.* at 204.

against a third party. The plaintiff sued the title company for the attorney fees incurred in maintaining the quiet title action. Under the "third-party tort rule," the court of appeals allowed the recovery of those fees as part of the damages stemming from the title company's negligence. 765 P.2d at 1282–83. Simply stated, the third-party tort rule provides that "when the natural consequence of one's negligence is another's involvement in a dispute with a third party, attorney fees reasonably incurred in resolving the dispute are recoverable from the negligent party as an element of damages." *Id.* at 1282. The rule only applies to the recovery of fees incurred in resolving third-party disputes caused by a defendant's negligence. It does not apply to fees incurred in recovering damages from that defendant.

We therefore reverse the award of attorney fees.

### IV. CROSS–APPEALS

*A. Breach of Implied Covenant of Good Faith and Fair Dealing and Bad Faith Refusal to Honor the Bond*

Plaintiff appeals the trial court's dismissal of Counts III and V of her complaint. Count III of the complaint alleges that all the defendants breached a duty to deal fairly with her and to act in good faith. Plaintiff does not set out any law or facts to support her allegation that either Atlas or Check Rite owed her a duty and that they breached that duty. Her brief only refers to facts relating to the conduct of Northwestern and Old Republic. In light of plaintiff's failure to provide us with any analysis or legal authority, we decline to address her claim against Atlas and Check Rite. *See Winter v. Northwest Pipeline Corp.*, 820 P.2d 916 (Utah 1991).

 Count V essentially restates the allegations of Count III. Count V asserts that plaintiff is entitled to recover damages from Northwestern and Old Republic for

their bad faith refusal to honor the lost instruments bond. As such, Counts III and V constitute a single claim for breach of an implied covenant of good faith and fair dealing against Northwestern and Old Republic.

Northwestern and Old Republic argue that for plaintiff to maintain a cause of action for failure to deal fairly and in good faith, she must establish that she had a contractual relationship with defendants. Plaintiff responds that her cause of action is in tort and does not require privity of contract.

Although we have recognized the right of an insured to maintain an action against his insurer for refusal to deal fairly and in good faith, we have not recognized the right of an injured third party to sue a tort-feasor's insurer. *See Beck v. Farmers Ins. Exch.*, 701 P.2d 795 (Utah 1985); *Ammerman v. Farmer's Ins. Exch.*, 19 Utah 2d 261, 430 P.2d 576 (1967). *Beck* held that an insured may sue his insurer for failure to deal fairly and in good faith in a first-party relationship and that such an action lies in contract, not in tort.[4] 701 P.2d at 800.

In *Ammerman*, this Court recognized a tort cause of action by an insured against his insurer for breach of an obligation to bargain fairly in a third-party context. We explained that the insurer has a fiduciary duty by reason of the insurance policy to defend the insured and that a breach of that duty gives rise to a separate cause of action for the *insured* against the insurer. The Court barred the injured third-party in that case from suing the insurer because there was no privity of contract. *Id.* at 263–64, 430 P.2d 576.

Under both *Beck* and *Ammerman*, the duty of an insurer to deal fairly is derived from the insurance contract. In the absence of a contractual relationship or statutory duty, a majority of the courts that have addressed this issue have been reluc-

---

**4.** The term "first-party" refers to an insurance agreement in which the insurer agrees to pay claims submitted to it by the insured for his or her losses. A "third-party" relationship exists where the insurer contracts to defend the in-

sured against claims made by third parties and to pay any resulting liability, up to a specified dollar amount. *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 798, n. 2 (Utah 1985).

tant to allow an injured third party to sue another's insurer for failure to bargain in good faith. *See, e.g., St. Joseph's Hosp. & Medical Ctr. v. Reserve Life Ins. Co.,* 154 Ariz. 303, 742 P.2d 804, 807 (Ct.App.1986), *vacated in part on other grounds,* 154 Ariz. 307, 742 P.2d 808 (1987); *Gunny v. Allstate Ins. Co.,* 108 Nev. 344, 830 P.2d 1335, 1335–36 (1992); *United Fire Ins. Co. v. McClelland,* 105 Nev. 504, 780 P.2d 193, 197 (1989); *Roach v. Atlas Life Ins. Co.,* 769 P.2d 158, 161 (Okla.1989); *Allstate Ins. Co. v. Amick,* 680 P.2d 362, 365 (Okla.1984); *Kranzush v. Badger State Mut. Casualty Co.,* 103 Wis.2d 56, 307 N.W.2d 256, 265 (1981). Our own court of appeals came to the same conclusion in *Pixton v. State Farm Mutual Automobile Insurance Co.,* 809 P.2d 746, 749 (Utah Ct.App.1991).

Plaintiff does not allege any facts that would support a finding of a contractual relationship between her and Northwestern or Old Republic. While it is conceivable that something other than a contractual relationship may impose a duty on an insurer to deal fairly with a third party, plaintiff has failed to allege any facts that might impose such a duty.

Plaintiff argues that under our decisions in *Beck* and *Culp Construction Co. v. Buildmart Mall,* 795 P.2d 650 (Utah 1990), privity of contract is not a prerequisite to maintaining a claim for failure to bargain in good faith. In support of this position, plaintiff relies on language in *Beck* and *Culp* that permits a plaintiff to bring a tort claim independent of a contract claim for breach of an implied covenant to deal in good faith. *Beck,* 701 P.2d at 800 n. 3; *Culp,* 795 P.2d at 654–55. Plaintiff, however, misunderstands the import of this language. It stands only for the proposition that the same facts giving rise to a breach of contract may also give rise to an independent tort claim, such as intentional infliction of emotional distress, fraud, or misrepresentation. To bring an independent tort claim, the plaintiff must allege all the elements of the claimed tort. Plaintiff has failed to allege anything remotely resembling an independent tort claim, but merely asserts that because she has been damaged, liability should be imposed.

Finally, plaintiff argues that defendants should be equitably estopped from denying a contractual relationship with her on the ground that Old Republic's communications with her and its investigation of her claim created a contractual relationship. The right to equitable estoppel arises when "conduct by one party leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct." *United Am. Life Ins. Co. v. Zions First Nat'l Bank,* 641 P.2d 158, 161 (Utah 1982). Assuming that plaintiff has made out a prima facie case for estoppel, she has not alleged facts demonstrating that Old Republic's conduct damaged her. Plaintiff's lost profits were the result of Atlas' conversion of her stock, for which she has already been awarded a judgment. Nothing in the record indicates that Old Republic's conduct caused plaintiff damages beyond that attributable to Atlas.

We affirm the dismissal of Counts III and V of the complaint.

### B. Breach of an Implied Third–Party Beneficiary Contract

Plaintiff also appeals the dismissal of Count IV of her complaint, which alleges that she is a third-party beneficiary under the lost instruments bond and that, as obligors, Old Republic and Northwestern breached their contractual duty to her.

Third-party beneficiaries are those " 'recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration.' " *Rio Algom Corp. v. Jimco, Ltd.,* 618 P.2d 497, 506 (Utah 1980) (quoting 4 Arthur L. Corbin, *Corbin on Contracts* § 774, at 6 (1960)); *see also Schwinghammer v. Alexander,* 21 Utah 2d 418, 420, 446 P.2d 414, 415 (1968). For a third party to have an enforceable right, the contracting parties must have clearly intended to confer a separate and distinct benefit upon the third party. *Rio Algom Corp.,* 618 P.2d at 506; *Tracy Collins Bank & Trust v. Dickamore,* 652 P.2d

1314, 1315 (Utah 1982); *Clark v. American Standard, Inc.*, 583 P.2d 618, 620 (Utah 1978). A third party who benefits only incidentally from the performance of a contract has no right to recover under that contract. *Mel Trimble Real Estate v. Fitzgerald*, 626 P.2d 453, 454 (Utah 1981); *Rio Algom Corp.*, 618 P.2d at 506; *Tracy Collins*, 652 P.2d at 1315; *Schwinghammer*, 21 Utah 2d at 420, 446 P.2d at 415.

Nothing in the bond indicates that Fletcher or Northwestern intended to confer on plaintiff the right to enforce payment. The bond only lists Atlas and Check Rite as obligees. Plaintiff argues that because the purpose of the bond is to safeguard against the presentation of the lost certificate, she is an intended beneficiary. Plaintiff, however, overlooks the fact that the bond is intended to safeguard and indemnify *Atlas and Check Rite* against a future claim on the lost certificate. It is not intended to protect plaintiff from purchasing a stock certificate that has been reported lost or stolen. Performance on the bond only incidentally benefits plaintiff by providing a fund from which her damages may ultimately be paid.

Since plaintiff is not a third-party beneficiary on the bond, we affirm the trial court's dismissal of Count IV.

The judgment in favor of plaintiff and against Atlas and Check Rite for conversion and wrongful refusal to transfer stock is affirmed. The trial court's denial of defendant's motion to strike plaintiff's affidavits and the dismissal of plaintiff's third, fourth, and fifth claims is also affirmed. The award of attorney fees to plaintiff is reversed.

HALL, C.J., HOWE, Associate C.J., DURHAM and ZIMMERMAN, JJ., concur.